# Exhibit A

B10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT _____ DISTRICT OF <u>MASSACHUSETTS</u> _____ | | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor: THE EDUCATION RESOURCES INSTITUTE, INC. | Case Number: 08-12540 |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request of payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>Department of the Treasury - Internal Revenue Service | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br>Internal Revenue Service<br>P.O. Box 21126<br>Philadelphia, PA  19114<br><br>Telephone number: 1-800-913-9358          Creditor Number: 16619622 | **Court Claim Number:** ____<br>*(If known)*<br><br>Filed on: _____ |
| Name and address where payments should be sent (if different from above):<br>Internal Revenue Service<br>15 NEW SUDBURY STREET<br>M/S 20800<br>BOSTON, MA  02203-0002<br><br>Telephone Number: (617) 316-2645 | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:**          $ 99,788,691.95<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>■ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br><br>Specify the priority of the claim. |
| **2. Basis for Claim:**          Taxes<br>    (See instruction #2 on reverse side.) | ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| **3. Last four digits of any number by which creditor identifies debtor:** ____ See Attachment<br><br>    **3a. Debtor may have scheduled account as:** _____<br>      (See instruction #3a on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. §507 (a)(4). |
| **4. Secured Claim** (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>**Nature of property or right of setoff:**      ☐ Real Estate   ☐ Motor Vehicle   ☐ Other<br>**Describe:**<br><br>**Value of Property:** $_____   **Annual Interest Rate** ____%<br><br>**Amount of arrearage and other charges as of time case filed included in secured claim,**<br><br>**if any:** $_____   **Basis for perfection:** _____<br><br>**Amount of Secured Claim:** $_____   **Amount Unsecured:** $_____ | ☐ Contributions to an employee benefit plan -11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507 (a)(7).<br><br>■ Taxes or penalties owed to governmental units - 11 U.S.C. §507 (a)(8). |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | ☐ Other - Specify applicable paragraph of 11 U.S.C. §507 (a)(___). |
| **7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See definition of "redacted" on reverse side.*)<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | Amount entitled to priority:<br><br>$ 99,788,691.95<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

| **Date:** 07/23/2008 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. | FOR COURT USE ONLY |
|---|---|---|
| | /s/ JULIA SWEENEY,<br>Bankruptcy Specialist<br>(617) 316-2645 | Internal Revenue Service<br>15 NEW SUDBURY STREET<br>M/S 20800<br>BOSTON, MA  02203-0002 | |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C §§ 152 and 3571.

# Proof of Claim for
# Internal Revenue Taxes

### Department of the Treasury/Internal Revenue Service

**In the Matter of:** THE EDUCATION RESOURCES INSTITUTE, INC.
31 ST. JAMES AVE., 4TH FLOOR
BOSTON, MA 02116

**Form 10**
Attachment

**Case Number**
08-12540

**Type of Bankruptcy Case**
CHAPTER 11

**Date of Petition**
04/07/2008

The United States has not identified a right of setoff or counterclaim. However, this determination is based on available data and is not intended to waive any right to setoff against this claim debts owed to this debtor by this or any other federal agancy. All rights of setoff are preserved and will be asserted to the extent lawful.

**Unsecured Priority Claims** under section 507(a)(8) of the Bankruptcy Code

| Taxpayer ID Number | Kind of Tax | Tax Period | | Date Tax Assessed | Tax Due | Interest to Petition Date |
|---|---|---|---|---|---|---|
| XX-XXX5329 | CORP-INC | 06/30/2005 | 1 | Pending Examination | $22,381,343.00 | $4,783,134.44 |
| XX-XXX5329 | WT-FICA | 12/31/2005 | | 03/31/2008 | $773.21 | $141.12 |
| XX-XXX5329 | CORP-INC | 06/30/2006 | 1 | Pending Examination | $23,382,872.00 | $1,606,600.79 |
| XX-XXX5329 | CORP-INC | 06/30/2007 | 1 | Pending Examination | $45,674,654.00 | $1,959,173.35 |
| | | | | | $91,439,642.21 | $8,349,049.74 |

### Total Amount of Unsecured Priority Claims: $99,788,691.95

1 PROPOSED TAX DEFICIENCY DETERMINED BY EXAMINATION OF DEBTOR(S) TAX RETURN.

B10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT _____ DISTRICT OF MASSACHUSETTS_____ | PROOF OF CLAIM |
| --- | --- |

| Name of Debtor: THE EDUCATION RESOURCES INSTITUTE, INC. | Case Number: 08-12540 |
| --- | --- |

**NOTE:** *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request of payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
| --- | --- |
| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>    Department of the Treasury - Internal Revenue Service | ■ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br>  Internal Revenue Service<br>  P.O. Box 21126<br>  Philadelphia, PA 19114<br><br>Telephone number: 1-800-913-9358          Creditor Number: 16619622 | **Court Claim Number:** 11_____<br>*(If known)*<br><br>Filed on:       07/23/2008_____ |
| Name and address where payments should be sent (if different from above):<br>  Internal Revenue Service<br>  15 NEW SUDBURY STREET<br>  M/S 20800<br>  BOSTON, MA 02203-0002<br><br>Telephone Number: (617) 316-2645 | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| | |
| --- | --- |
| **1. Amount of Claim as of Date Case Filed:**          $ 914.33<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>■ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br><br>Specify the priority of the claim. |
| **2. Basis for Claim:**          Taxes_____<br>      (See instruction #2 on reverse side.) | ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| **3. Last four digits of any number by which creditor identifies debtor:** ____ See Attachment _____<br><br>  **3a. Debtor may have scheduled account as:** _____<br>      (See instruction #3a on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. §507 (a)(4). |
| **4. Secured Claim** (See instruction #4 on reverse side.)<br>  Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>  **Nature of property or right of setoff:**     ☐ Real Estate     ☐ Motor Vehicle     ☐ Other<br>  **Describe:**<br><br>  **Value of Property:**$_____  **Annual Interest Rate** ___%<br><br>  **Amount of arrearage and other charges as of time case filed included in secured claim,**<br><br>  **if any:** $_____          **Basis for perfection:** _____<br><br>  **Amount of Secured Claim:** $_____     **Amount Unsecured:** $_____ | ☐ Contributions to an employee benefit plan -11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507 (a)(7).<br><br>■ Taxes or penalties owed to governmental units - 11 U.S.C. §507 (a)(8). |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | ☐ Other - Specify applicable paragraph of 11 U.S.C. §507 (a)(___). |
| **7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See instruction 7 and definition of "redacted" on reverse side.*)<br><br>  DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>  If the documents are not available, please explain: | Amount entitled to priority:<br><br>    $ 914.33_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

| | | |
| --- | --- | --- |
| **Date:** 04/10/2009 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. | FOR COURT USE ONLY |
| /s/ JULIA SWEENEY,<br>Bankruptcy Specialist<br>(617) 316-2645 | Internal Revenue Service<br>15 NEW SUDBURY STREET<br>M/S 20800<br>BOSTON, MA 02203-0002 | |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C §§ 152 and 3571.

# Exhibit B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SARAH BANNISTER, LABARRON TATE,
BRANDON HOOD,

                    Plaintiffs,

        - against -

UNITED STATES TREASURY DEPARTMENT,
STEVEN T. MNUCHIN, in his official capacity as the
Secretary of the Treasury, BRIAN P. BROOKS, in his
official capacity as the acting Comptroller of the
Currency,

               Defendants.

20 Civ. 4458 (MKV)

# MEMORANDUM OF LAW IN SUPPORT OF THE
# DEFENDANTS' MOTION TO DISMISS

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
Attorney for the Defendants
86 Chambers Street, Third Floor
New York, New York 10007
Tel:    (212) 637-2525

        ILAN STEIN
Assistant United States Attorney
      – Of Counsel –

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ............................................................................................... 3

    A.    Factual Background ........................................................................ 3

    B.    Procedural Background.................................................................... 6

ARGUMENT .................................................................................................... 6

    A.    Plaintiffs Lack Article III Standing Because Their Injuries Are Neither Traceable to Defendants' Actions Nor Redressable ............................... 6

    B.    The Amended Complaint Fails to State a Claim and Should Be Dismissed Under Rule 12(b)(6)........................................................................ 9

        1.    The Amended Complaint Fails to State an APA Claim Against Treasury ................................................................... 10

        2.    The Amended Complaint Fails to State an APA Claim Against the OCC ........................................................................... 13

        3.    The Amended Complaint Fails to State a Claim Under the Declaratory Judgment Act ......................................................... 16

CONCLUSION.................................................................................................. 16

# TABLE OF AUTHORITIES

Cases

*Allen v. Wright*,
    468 U.S. 737 (1984) ................................................................................... 7

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................................. 9, 15

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................. 10

*Bloomberg L.P. v. Commodity Futures Trading Comm'n*,
    2013 WL 2458283 (D.D.C. June 7, 2013) ................................................ 7

*Cacchillo v. Insmed, Inc.*,
    638 F.3d 401 (2d Cir. 2011) ...................................................................... 6

*Clapper v. Amnesty Int'l*,
    568 U.S. 398 (2013) ................................................................................... 6

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ................................................................................. 11

*Harris v. FAA*,
    353 F.3d 1006 (D.C. Cir. 2004) .............................................................. 11

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................................. 12

*Hewitt v. Helms*,
    482 U.S. 755 (1987) ................................................................................... 9

*In re Joint E. & S. Dist. Asbestos Litig.*,
    14 F.3d 726 (2d Cir. 1993) ...................................................................... 15

*In re Residential Capital LLC*,
    524 B.R. 563 (S.D.N.Y. Bankr. 2015) ..................................................... 11

*L-7 Designs, Inc. v. Old Navy, LLC*,
    647 F.3d 419 (2d Cir. 2011) .................................................................... 10

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................... 6, 7, 8

*Madden v. Midland Funding, LLC*,
    786 F.3d 246 (2d Cir. 2015) ...................................................................... 5

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................................... 14

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
    366 F.3d 930 (D.C. Cir. 2004) .......................................................................... 7

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ........................................................................................... 10

*Polanco v. Drug Enf't Admin.*,
    158 F.3d 647 (2d Cir. 1998) ............................................................................. 11

*Sai Kwan Wong v. Doar*,
    571 F.3d 247 (2d Cir. 2009) ............................................................................. 11

*Selevan v. N.Y. Thruway Auth.*,
    584 F.3d 82 (2d Cir. 2009) ............................................................................... 9

*Shipping Fin. Servs. Cor. v. Drakos*,
    140 F.3d 129 (2d Cir. 1998) ............................................................................. 6

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ........................................................................................... 7

*Springfield Hosp. v. Hoffman*,
    488 F. App'x 534 (2d Cir. 2012) ...................................................................... 15

*Taylor v. Bernanke*,
    2013 WL 4811222 (E.D.N.Y. Sept. 9, 2013) ................................................... 7

*Natural Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*,
    710 F.3d 71 (2d Cir. 2013) ............................................................................... 6

*W.R. Huff Asset Mgmt Co., LLC v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008) ............................................................................. 8

Statutes

5 U.S.C. ch. 5 ......................................................................................................... 1

5 U.S.C. § 704 ........................................................................................................ 10, 11

12 U.S.C. § 1 .......................................................................................................... 8, 9, 13

12 U.S.C. § 85 ........................................................................................................ 4

20 U.S.C. § 1078(d)(2) .......................................................................................... 14

20 U.S.C. § 1087-2 ................................................................................................ 1

28 U.S.C. § 2201 ........................................................................................................ 2

28 U.S.C. § 2401(a) ................................................................................................ 11

Rules

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 9

Regulations

85 Fed. Reg. 33 ................................................................................................... 2, 5

85 Fed. Reg. 44 ...................................................................................................... 5

Defendants Steven T. Mnuchin, in his official capacity as Secretary of the United States Department of the Treasury, the United States Treasury Department (together with Steven T. Mnuchin, "Treasury"), and Brian P. Brooks, in his official capacity as the acting Comptroller of the Currency ("OCC," and together with Treasury, "Defendants"), by their attorney, Audrey Strauss, Acting United States Attorney for the Southern District of New York, respectfully submit this memorandum in support of their motion to dismiss the First Amended Complaint (ECF No. 6 ("Amended Complaint" or "Am. Compl.")), under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This case concerns student loans that Plaintiffs received from Sallie Mae[1] more than fifteen years ago. Plaintiffs contend that Sallie Mae illicitly used public funds to originate the loans and that the loans are therefore void. Surprisingly, in light of these allegations, Plaintiffs have not asserted any claims against Sallie Mae or its successor, Navient. Instead, they bring claims under the Administrative Procedure Act, 5 U.S.C. ch. 5 ("APA") against Treasury and the OCC, entities that have not caused Plaintiffs any injury; did not originate, own, or transfer their loans; and have not played a direct role in Plaintiffs' alleged injuries. To be sure, Plaintiffs allege that Treasury should have enjoined Sallie Mae from using public funds to originate their loans. They claim that Treasury's failure to act constitutes a violation of the APA. They further challenge as arbitrary

---

[1] In 1972, Congress created Sallie Mae to enhance financial support for federally guaranteed student loans. *See* 20 U.S.C. § 1087-2. Sallie Mae was authorized by statute to purchase student loans and college facility loans, and to make warehousing advances to lenders. *Id.* § 1087-2(d) (authorizing Sallie Mae to, *inter alia*, "make advances on the security of, purchase, or repurchase . . . student loans which are insured by the [government]"; "buy, sell, hold, underwrite, or otherwise deal in obligations . . . for the purpose of making or purchasing insured loans"; and "undertake a program of loan insurance pursuant to agreements with the [government]"). Congress appropriated $5 million "for making advances for the purpose of helping to establish [Sallie Mae]." *Id* § 1087-2(b)(3).

1

and capricious an OCC rule that establishes that the interest term on a loan originated by a national bank remains permissible[2] after the bank transfers the loan to a third party, which the OCC promulgated in May 29, 2020, more than fifteen years after Plaintiffs received their loans.  Finally, Plaintiffs seek a declaratory judgment from this Court, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that Congress did not authorize public funds to be used for the origination of Plaintiffs' loans and that the loans were not funded or authorized by the federal government.

Plaintiffs' claims should be dismissed.  As an initial matter, Plaintiffs lack standing to assert these claims because they have not alleged that Defendants caused any of their injuries nor that the relief they seek in this action would redress those injuries.  Even if Plaintiffs could establish standing, their claims would still fail because they do not state a claim upon which relief can be granted.  Plaintiffs' claims against Treasury are time-barred as they accrued no later than 2005, more than fifteen years before they filed this action.  Even if that were not so, Plaintiffs have not advanced any well-pleaded allegations that Treasury took a "final agency action" as required for Plaintiffs to state a claim under the APA, and, in any event, Treasury's decision not to enjoin Sallie Mae was committed to agency discretion.  As to the OCC's Final Rule, Plaintiffs fail to identify any ground on which to challenge that Rule, which was promulgated at least fifteen years after Plaintiffs' injury accrued and applies to loans originated by national banks, not Sallie Mae.

The Court should therefore dismiss the Amended Complaint.

---

[2] "Federal law establishes that national banks and savings associations (banks) may charge interest on loans at the maximum rate permitted to any state-chartered or licensed lending institution in the state where the bank is located. . . . Th[e] rule clarified that when a bank transfer a loan, the interest that was permissible before the transfer continues to be permissible after the transfer."  Office of the Comptroller of the Currency, *Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred*, 2020 WL 2836957, 85 Fed. Reg. 33,530, 33,530 (June 2, 2020).

# BACKGROUND

## A.    Factual Background

Plaintiffs allege that they received private student loans from the Student Loan Marketing Association ("Sallie Mae"). Am. Compl. ¶¶ 2-4.  LaBarron Tate took out her loan on July 3, 2002; Brandon Hood, on October 10, 2002; and Sarah Bannister, on August 9, 2005. *Id.* ¶¶ 56-58.  Sallie Mae was created "to facilitate the secondary market" for loans issued under the "Guaranteed Loan Program . . . and the National Direct Student Loan [Program]." *Id.* ¶¶ 10, 14.  According to Plaintiffs, Sallie Mae was privatized over a period of time between 1996 and 2004, and Treasury created the Office of Sallie Mae Oversight to "ensure that Federal funds [we]re not subsidizing non-FFEL guaranty activity." *Id.* ¶ 30.  Plaintiffs claim that "Congress split Sallie Mae in[] two: the public entity called SLMA . . . would hold all the federal property and federal assets while a new private corporation known as SLM Corp. would be used to conduct new commercial activity." *Id.* ¶ 29.  From that point forward, "if any loans were made or facilitated by SLM, they could not be funded with proceeds from debt issued by the GSE nor sold to the GSE." *Id.* ¶ 32.  "Congress and Treasury permitted Sallie Mae to *facilitate* the origination of private loans and to purchase loans on the secondary market, but Sallie Mae was not permitted to *originate* private loans." *Id.* ¶ 40.  Plaintiffs allege that, at some point, Treasury "began to suspect that Sallie Mae was . . . blurring these lines," *id.* ¶ 41, "originating private loans through its back-office servicing agreements under which SLMA would process and disburse these loans," *id.* ¶ 42 (quoting unknown source[3]).  Plaintiffs further allege that Sallie Mae was "using federal funds[4] to originate

---

[3] Throughout the Amended Complaint, Plaintiffs include quotes but do not provide any citations, dates, or other information that would permit Defendants or the Court to identify their provenance. *See generally* Am. Compl.

[4] Plaintiffs refer in their pleadings to "federal funds" and "public funds," Am. Compl. ¶¶ 24, 44, 46, 66; but Sallie Mae was a "private corporation" that was "financed by private capital."  20

private student loans in express violation of its fiduciary duties, Titles 12 and 20, and numerous provisions of Title 18." *Id.* ¶ 46.[5]

Plaintiffs allege that Treasury did nothing to prevent Sallie Mae from originating their loans because, in Treasury officials' view, the agency had "weak enforcement tools" and there was "a lack of general consensus on how to use them." *Id.* ¶ 49 (quoting unknown source). They further allege that Treasury "failed to act because government officials were unable to 'reach consensus' on the precise meaning of the law." *Id.* ¶ 52 (quoting unknown source).

With respect to the OCC, Plaintiffs allege that, on May 29, 2020, it "issued a final rule identified as 'Docket ID OCC-2019-0027, Permissible Interest on Loans That Are Sold, Assigned,

---

U.S.C. § 1087-2(a). Plaintiffs fail adequately to allege how Sallie Mae "us[ed] federal funds"; to be sure, Sallie Mae received certain benefits owing to its status as a government-sponsored enterprise, such as exemptions from most state and local taxes and access to the agency debt market for funding, but it generally did not "us[e] public funds." *See* U.S. Dep't of Treasury, Office of Sallie Mae Oversight, *Lessons Learned From the Privatization of Sallie Mae* 7, 49-50 (2006), *available at* https://www.treasury.gov/about/organizational-structure/offices/Documents/Sallie MaePrivatizationReport.pdf.

[5] Congress established Sallie Mae in 1972 as a government-sponsored enterprise to help students by facilitating a secondary market in federally guaranteed student loans. U.S. Dep't of the Treasury, *Treasury Announces Successful Privatization of Sallie Mae* (Dec. 29, 2004), *available at* https://www.treasury.gov/press-center/press-releases/Pages/js2173.aspx. As mentioned above, Sallie Mae was authorized to "make advances on the security of, purchase, or repurchase . . . student loans which are insured by the [government]"; "buy, sell, hold, underwrite, or otherwise deal in obligations . . . for the purpose of making or purchasing insured loans"; and "undertake a program of loan insurance pursuant to agreements with the [government]." 20 U.S.C. § 1087-2. In 1996, Congress enacted the SLMA Reorganization Act, which began the process of converting Sallie Mae into a private business while meeting the needs of the borrowing student public. *Id.* § 1087-3. That reorganization allowed the new, private Sallie Mae to engage in business practices outside of the limited charter of a government-sponsored enterprise, after which Sallie Mae began to originate student loans. Sallie Mae, *SLM Corporation Annual Report 2005*, *available at* https://www.salliemae.com/assets/investors/shareholder/annual-reports/SallieMaeFY2005AnnualReport1.pdf. In 2004, Sallie Mae completed its privatization process. Erin Dillon, *Leading Lady: Sallie Mae and the Origins of Today's Student Loan Controversy* 7 (May 2007), *available at* https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/EDSCTRUS/E070514D.pdf.

or Otherwise Transferred' (['] Final Rule')." *Id.* ¶ 85. "The Final Rule states, in part, that, 'Transferred loans. Interest on a loan that is permissible under 12 U.S.C. § 85 shall not be affected by the sale, assignment, or other transfer of the loan.'" *Id.* ¶ 86. The rule clarified that "when a national bank or savings association . . . sells, assigns, or otherwise transfers a loan, interest permissible before the transfer continues to be permissible after the transfer." *See* Office of the Comptroller of the Currency, *Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred*, 2020 WL 2836957, 85 Fed. Reg. 33,530, 33,530 (June 2, 2020) (hereinafter, "Final Rule"). This rule "reaffirm[ed] the longstanding understanding that a bank may transfer a loan without affecting the permissible interest term." *Id.* The rule was promulgated in response to *Madden v. Midland Funding, LLC*, a Second Circuit decision in a case involving credit-card debt in which the Court concluded that a purchaser of a loan originated by a national bank could not charge interest at the rate permissible for the bank if that rate would be impermissible under state law. 786 F.3d 246, 250 (2d Cir. 2015). The Final Rule was promulgated to "clarify that a bank may transfer a loan without impacting the permissibility or enforceability of the interest term in the loan contract, thereby resolving the legal uncertainty created by the Madden decision." Final Rule, 85 Fed. Reg. at 33,531.

The Final Rule does not "address which entity is the true lender when a bank transfers a loan to a third party." *Id.* at 33,534. To address that issue, on July 22, 2020, the OCC proposed a new regulation to determine which entity is the "true lender" when a national bank or Federal savings association makes a loan in the context of a partnership between a bank and a third party. Under this proposed rule, "a bank makes a loan if, as of the date of origination, it is named as the lender in the loan agreement or funds the loan." *National Banks and Federal Savings Associations as Lenders*, 85 Fed. Reg. 44,223 (proposed July 22, 2020) (hereinafter, "True Lender Rule").

## B.     Procedural Background

Plaintiffs filed their Complaint on June 11, 2020.  (ECF No. 1.)  They filed their Amended Complaint on June 18, 2020.  (ECF No. 5.)  On September 15, 2020, Defendants filed a letter motion requesting a pre-motion conference (ECF No. 16), to which Plaintiffs consented by letter on September 21, 2020 (ECF No. 17).  The Court denied Defendants' request for a pre-motion conference and issued a briefing schedule by Order dated September 25, 2020.  (ECF No. 18.)

## ARGUMENT

## A.     Plaintiffs Lack Article III Standing Because Their Injuries Are Neither Traceable to Defendants' Actions Nor Redressable

The Court should dismiss the Amended Complaint because Plaintiffs lack standing.  "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 408 (2013).  "[S]tanding is a federal jurisdictional question determining the power of the court to entertain the suit." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (internal quotation marks omitted).  To satisfy Article III's standing requirements, a plaintiff must "satisfy three elements: (a) the plaintiff must suffer an 'injury in fact,' (b) that injury must be 'fairly traceable' to the challenged action, and (c) the injury must be likely to be 'redressed by a favorable decision' of the federal court." *Natural Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 79 (2d Cir. 2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  "A plaintiff must demonstrate standing for each claim and form of relief sought." *Cacchillo*, 68 F.3d at 404.  Moreover, "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof . . . ." *Lujan*, 504 U.S. at 561 (citations and quotation marks omitted).  "[W]hen the question to be considered is one involving jurisdiction of a federal court, jurisdiction must be shown

affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Shipping Fin. Servs. Cor. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998).

Plaintiffs lack standing because (1) they have not established that any injury they suffered is "fairly . . . trace[able] to" Treasury's alleged decision not to enjoin Sallie Mae from originating Plaintiffs' loans or the OCC's promulgation of the Final Rule, and (2) Plaintiffs have failed to establish that their alleged injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. 561 (1992) (internal quotation marks omitted).

Plaintiffs have not alleged that their injuries are traceable to the Defendants. Plaintiffs themselves allege that Sallie Mae—not Treasury or the OCC—was the entity that impermissibly originated Plaintiffs' loans. Sallie Mae's intervening conduct defeats Plaintiffs' standing. Courts, including the Supreme Court, have consistently held plaintiffs fail to show traceability where their alleged injuries are caused by third parties' intervening conduct. *See Allen v. Wright*, 468 U.S. 737, 756-57 (1984) (no standing to sue Treasury officer where plaintiffs alleged that tax exemptions provided to schools with discriminatory policies diminished plaintiffs' ability to have their children educated in integrated schools); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-45 (1976) (no standing to sue Treasury officer where plaintiffs alleged that IRS ruling allowing favorable tax treatment to nonprofit hospital offering only emergency room services to indigents resulted in denial of services to plaintiffs); *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938-44 (D.C. Cir. 2004) (no standing where plaintiffs could not show that, in absence of Title IX enforcement policy, schools would continue men's wrestling programs); *Taylor v. Bernanke*, No. 13 Civ. 1013, 2013 WL 4811222, at *9 (E.D.N.Y. Sept. 9, 2013) (no standing where plaintiffs failed to establish that lack of final regulation would inevitably result in ongoing proprietary trading); *Bloomberg L.P. v. Commodity Futures Trading*

7

*Comm'n*, No. 13-523 (BAH), 2013 WL 2458283, at *19, 23-26 (D.D.C. June 7, 2013) (no standing to sue CFTC where plaintiffs alleged that CFTC regulation treating two types of financial instruments differently might cause regulated parties to engage in behavior injurious to plaintiff). Plaintiffs themselves acknowledge that it was Sallie Mae that engaged in the allegedly improper conduct, and they fail to allege, much less with well-pleaded factual allegations, that Defendants had any duty to prevent Sallie Mae's conduct.

With respect to the OCC, Plaintiffs do not even allege that the OCC has authority to regulate Sallie Mae. Nor could they: The OCC charters, regulates, and supervises national banks and federal savings associations as well as federal bank branches and agencies of foreign banks. *See* 12 U.S.C. § 1 *et seq.* It does not regulate or have any authority over Sallie Mae or Navient, the entities that originated and currently service Plaintiffs' loans. Moreover, the only OCC action that Plaintiffs challenge is the Final Rule, which was promulgated more than fifteen years after Plaintiffs' alleged injuries. Plaintiffs have not alleged that the Final Rule has contributed to their injuries in any way.

Plaintiffs have also failed to establish redressability, which is the "non-speculative likelihood that the injury can be remedied by the requested relief." *W.R. Huff Asset Mgmt Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008). "[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561. In this action, Plaintiffs seek a declaration that "the United States Congress never authorized public funds to be used for the origination of Tate's, Hood's, or Bannister's Loans and that these Loans were not insured or guaranteed under Part B nor made under Part E nor Part D of Title 20, nor otherwise made, insured, guaranteed or in any way funded nor authorized by the United States Treasury." Am. Compl. ¶ 66. Even if this Court were to grant

that relief, it would not make it likely that any alleged injury would be redressed. To the extent

Plaintiffs' alleged injury is their requirement to continue to repay student loans to Navient, which

is not even a party to this action, the requested declaration would not redress any harm relevant

to the Defendants' conduct. *See Hewitt v. Helms*, 482 U.S. 755, 761 (1987) ("The real value of

the judicial pronouncement—what makes it a proper judicial resolution of a 'case or

controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the

behavior of the defendant towards the plaintiff*."). Nothing about the pronouncement Plaintiffs

seek could affect Defendants' behavior towards the Plaintiffs; Navient is the only party whose

behavior might be affected, and even then, any effect would be speculative. With respect to the

OCC's Final Rule, Plaintiffs cannot establish that a finding that the Rule is "arbitrary and

capricious" would redress any of Plaintiffs' alleged injuries. As mentioned, the OCC does not

regulate Sallie Mae or Navient, *see* 12 U.S.C. § 1 *et seq.*, and Plaintiffs do not allege that the

Final Rule affects how Treasury exercises its discretion.

For these reasons, Plaintiffs lack standing to assert these claims.

**B.    The Amended Complaint Fails to State a Claim and Should Be Dismissed Under
Rule 12(b)(6)**

Even if Plaintiffs had standing to assert their claims, the Court should still dismiss those

claims because Plaintiffs fail to state a claim upon which relief can be granted. Fed. R. Civ. P.

12(b)(6). A motion to dismiss under Rule 12(b)(6) should be granted when the complaint fails to

allege sufficient "factual content that allows the court to draw the reasonable inference that the

defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court must "assume all 'well-

pleaded factual allegations' to be true, and 'determine whether they plausibly give rise to an

entitlement to relief.'" *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009) (quoting

*Iqbal*, 556 U.S. at 679). Allegations that are "no more than conclusions[] are not entitled to the

assumption of truth," and "'naked assertion[s]' devoid of 'further factual enhancement'" or "the-defendant-unlawfully-harmed-me accusation[s]" are not sufficient to show that a plaintiff is entitled to relief. *Iqbal*, 556 U.S. at 678-79 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Nor must a court accept as true "legal conclusions" or "'a legal conclusion couched as a factual allegation.'" *Id.* Allegations in a complaint that are contradicted by either more specific allegations or documentary evidence are not entitled to a presumption of truthfulness. *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).

### 1. The Amended Complaint Fails to State an APA Claim Against Treasury

Plaintiffs fail to state a claim against Treasury for three independent reasons. First, Plaintiffs have not alleged a final agency action, as required to assert a valid APA claim. *See* 5 U.S.C. § 704. The Supreme Court has explained that when a plaintiff challenges an agency's failure to act, as Plaintiffs do here, the challenge is reviewable under the APA "only where a plaintiff asserts that any agency failed to take a *discrete* agency action that it is *required* to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Plaintiffs have not identified any source of law that *required* Treasury to enjoin Sallie Mae from originating Plaintiffs' loans. Plaintiffs' sole allegation regarding Treasury's oversight responsibilities asserts that Treasury's Office of Sallie Mae Oversight was created "to police the 'firewall' that was supposed to keep the public funds completely separate from commercial activity." Am. Compl. ¶ 30. Yet Plaintiffs themselves do not allege that Treasury was required—or even empowered—to enjoin Sallie Mae's activities rather than to monitor Sallie Mae.[6] Because Plaintiffs have not asserted that Treasury failed to

---

[6] The Office of Sallie Mae Oversight, which was granted authority to monitor Sallie Mae's privatization, had weak enforcement tools, largely limited to preparing reports for Congressional review or pursing an action in court for certain limited compliance provisions. *See* Office of Sallie Mae Oversight Records, *available at* https://www.archives.gov/files/records-mgmt/rcs/schedules/departments/department-of-the-treasury/rg-0056/n1-056-03-008_sf115.pdf;

take a discrete agency action that it was required to take, they have not identified a "final agency action" that is reviewable by this Court. *See* 5 U.S.C. § 704.

To the extent the Court concludes that Treasury's failure to enjoin Sallie Mae constitutes a "final agency action," Plaintiffs' claims would still fail because they are time-barred. "Section 2401(a) supplies the statute of limitations for suits challenging agency action under the APA." *Polanco v. Drug Enf't Admin.*, 158 F.3d 647, 652 (2d Cir. 1998). That provision establishes that a "civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). Suits challenging final agency action pursuant to section 704, such as the action here, must similarly be commenced within six years after the right of action accrues. *See Harris v. FAA*, 353 F.3d 1006, 1009-1010 (D.C. Cir. 2004). "Under the APA, the statute of limitations begins to run at the time the challenged agency action becomes final." *Sai Kwan Wong v. Doar*, 571 F.3d 247, 263 (2d Cir. 2009).

Because Plaintiffs allege that the final agency action at issue is "Treasury's failure to take remedial action against Sallie Mae" at the time their loans were originated, their claims accrued when their loans were originated in 2002 and 2005. Am. Compl. ¶¶ 56-58; *see, e.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 798-99 (1992) ("[t]o determine when an agency action is final," the Supreme Court has "looked to, among other things, whether its impact 'is sufficiently direct and immediate' and has a 'direct effect on . . . day-to-day business'" (internal quotation marks omitted)); *see also In re Residential Capital LLC*, 524 B.R. 563, 592 (S.D.N.Y. Bankr. 2015)

---

*see also* U.S. Dep't of Treasury, Office of Sallie Mae Oversight, *Lessons Learned From the Privatization of Sallie Mae* 1 (2006), *available at* https://www.treasury.gov/about/organizational-structure/offices/Documents/Sallie MaePrivatizationReport.pdf.

(concluding that claims relating to allegedly illicit loans accrued at time of origination). Because Plaintiffs did not file their claims until 2020—at least 15 years after their causes of action accrued and after Sallie Mae was fully privatized[7]— Plaintiffs' APA claims against Treasury are untimely.

  Third, to the extent Treasury had authority to enjoin Sallie Mae from originating Plaintiffs' loans, any such decision would have been committed to agency discretion. Plaintiffs have not identified any statute giving rise to a non-discretionary responsibility by Treasury to enjoin Sallie Mae. In fact, they do not identify any statute relevant to Treasury's oversight of Sallie Mae. Instead, Plaintiffs allege that Treasury failed to act after concluding "that nothing could be done because of 'weak enforcement tools' and a lack of general consensus on how to use them." Am. Compl. ¶ 49. At bottom, Plaintiffs complain that Treasury decided not to bring an enforcement action against Sallie Mae; that sort of decision is "generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). As the Supreme Court has explained, the tradition that a non-enforcement decision is committed to agency discretion is underpinned by the recognition that these decisions "often involve[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," such as "whether the particular enforcement action requested best fits the agency's overall policies." *Id.* Plaintiffs' own allegations suggest that Treasury decided not to act after considering the enforcement tools at its disposal and after failing to arrive at a consensus that using those tools to enjoin Sallie Mae was the best course of

---

[7] *See* Am. Compl. ¶¶ 28-54; *see also* U.S. Dep't of Treasury, Office of Sallie Mae Oversight, *Lessons Learned From the Privatization of Sallie Mae* 1 (2006), available at https://www.treasury.gov/about/organizational-structure/offices/Documents/Sallie MaePrivatizationReport.pdf.

action. Am. Compl. ¶ 49. That is precisely the kind of decision that the Supreme Court has concluded lies within the agency's discretion. *Chaney*, 470 U.S. at 831.

For these reasons, the Court should dismiss Plaintiffs' APA claims against Treasury.

**2. The Amended Complaint Fails to State an APA Claim Against the OCC**

Plaintiffs' APA claim against the OCC similarly fails. Plaintiffs assert that the OCC's Final Rule "should be set aside as arbitrary and capricious." Am. Compl. ¶ 87. They claim that: (1) the Final Rule "fails to articulate whether 'permissible' includes 'not impermissible,'" which is problematic because it "will be used by . . . Title 20 guaranty agencies . . . [to] assign[] loans at illegal rates of interest," *id.* ¶¶ 87-88; (2) the rule "fails to differentiate between 'interest rate' and the broader concept of 'interest,'" which has resulted in the OCC "act[ing] in excess of authority," *id.* ¶¶ 87, 89; and (3) the rule "operates as a *de facto* definition of the term 'loan' which forecloses the utility of the OCC's assurance that it is developing a separate protocol to regulate the 'true lender,'" and "immunizes non-bank lenders dealing and uttering loans from collateral attack," *id.* ¶¶ 87, 91. Each of these grounds fails.

Plaintiffs' first assertion—that the Final Rule is vague as to the scope of the term "permissible"—fails for three primary reasons. First, the entire basis of Plaintiffs' claim is that the alleged vagueness regarding the term "permissible" will allow "Title 20 guaranty agencies, including several of Sallie Mae's affiliates and subsidiaries," to "assign[] loans at illegal rates of interest." *Id.* ¶ 88. Yet, as mentioned above, OCC does not regulate "Title 20 guaranty agencies." *See* 12 U.S.C. § 1 *et seq.* Therefore, the Final Rule could not be used by those agencies "as the legal authority for assigning loans at illegal rates of interest[.]" *Id.* ¶ 88. Second, the law at issue, 20 U.S.C. § 1078(d)(2), is clear on its face that usury laws do not apply to loans that are "insured (i) by the United States under this part, or (ii) by a guaranty agency under a program covered by

an agreement made pursuant to [the statute]." Nothing in the Final Rule implicates, much less

obscures, the clear statutory language in section 1078(d)(2).

Finally, Plaintiffs do not advance any well-pleaded allegations regarding how the use of

the term "permissible" might render the Final Rule "arbitrary and capricious." The Supreme Court

has explained that an agency's decision may be considered "arbitrary and capricious" if it

(1) "relied on factors which Congress has not intended it to consider"; (2) "entirely failed to

consider an important aspect of the problem"; (3) "offered an explanation for its decision that runs

counter to the evidence before the agency"; or (4) "offered an explanation so implausible that it

could be ascribed to a difference in view of the produce of agency expertise." *Motor Vehicle*

*Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). Plaintiffs

do not make any allegations whatever regarding the factors the OCC relied on in promulgating the

Final Rule, the explanations it offered in support of the Rule, or the considerations it had when

adopting the Final Rule. Simply put, Plaintiffs make no allegations that connect their critique of

the use of the term "permissible" to their claim that the Final Rule is "arbitrary and capricious."

Plaintiffs next attack the Final Rule on the basis that it fails to differentiate between

"interest" and "interest rate." Yet Plaintiffs do not advance any relevant factual allegations.

Although they assert that the OCC has "acted in excess of statutory scope" by using the term

"interest" rather than "interest rate" in the Final Rule, Plaintiffs do not identify any specific statute

whose scope was exceeded. Nor do they explain how the failure to add the word "rate" after

"interest" might have led the OCC to act "in excess of statutory scope" or in any manner that is

relevant to Plaintiffs' claim. In addition, Plaintiffs' claim is founded on a factual error. The Final

Rule does, in fact, refer to interest "rates." The Final Rule states: A bank "may charge *interest* on

loans at the maximum *rate* permitted to any state-chartered or licensed lending institution in the

state where the bank is located [and that] [t]his rule clarifies that when a bank transfers a loan, the interest permissible before the transfer continues to be permissible after the transfer." 85 Fed. Reg. at 33,530 (emphasis added). Plaintiffs' argument therefore lacks merit.

Plaintiffs' final attack is that the Final Rule allegedly "does not offer a formal definition of the term 'loan'" and instead creates "a *de facto* definition of 'loan.'" Am. Compl. ¶ 91. That definition, they claim, "forecloses the utility of the OCC's assurance that it is developing a separate protocol to regulate the 'true lender.'" *Id.* ¶ 87. This argument, like Plaintiffs' other arguments, fail for multiple reasons. First, Plaintiffs do not adequately allege any causal nexus between the Final Rule's failure to provide an express definition of the term "loan" in favor of a *de facto* definition, on the one hand, and the true-lender regulation, on the other. Second, Plaintiffs do not allege how the Final Rule's *de facto* definition of the term "loan" affects their ability "to demonstrate that their private loans were made by Sallie Mae and not its national banking partners." *Id.* ¶ 92. Plaintiffs' allegations in this regard are entirely conclusory and therefore do not give rise to a valid claim for relief. *Iqbal*, 556 U.S. at 679. Finally, Plaintiffs' allegations fail because the OCC has, in fact, issued a "true lender" regulation. On July 22, 2020, the OCC proposed the True Lender Rule, which states, in relevant part: "a bank makes a loan if, as of the date of origination, it is named as the lender in the loan agreement or funds the loan." 85 Fed. Reg. at 44,223. Because the OCC has issued a "true lender" rule, this Court should reject Plaintiffs' implausible allegation that the Final Rule's failure to explicitly define the term "loan" somehow "forecloses the utility of the OCC's assertion that it is developing a separate protocol to regulate the 'true lender.'" Am. Compl. ¶ 87.

3.      **The Amended Complaint Fails to State a Claim Under the Declaratory
         Judgment Act**

Finally, Plaintiffs' claim under the Declaratory Judgment Act should be dismissed.  The

Declaratory Judgment Act provides a specific remedy for plaintiffs who are alleging a claim based

on a substantive source of rights, but does not itself confer any substantive rights.  *See Springfield*

*Hosp. v. Hoffman*, 488 F. App'x 534, 535 (2d Cir. 2012) (holding that the plaintiff "cannot

maintain an action for a declaratory judgment without an underlying federal cause of action"); *In*

*re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993) (noting that the Declaratory

Judgment Act does not "provide an independent cause of action," and that its "operation is

procedural only—to provide a form of relief previously unavailable").  "Therefore, a court may

only enter a declaratory judgment in favor of a party who has a substantive claim of right to such

relief."  *Id.*  For the reasons described above, Plaintiffs have not adequately alleged that they have

a substantive claim of right to relief.  Their Declaratory Judgment Act claim therefore fails.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this action.

Dated:   New York, New York
         October 26, 2020

                              Respectfully submitted,

                              AUDREY STRAUSS
                              Acting United States Attorney for the
                              Southern District of New York,
                              Attorney for the Defendants

              By:      /s/ *Ilan Stein*
                    _____

                              ILAN STEIN
                              Assistant United States Attorney
                              86 Chambers Street, Third Floor
                              New York, New York 10007
                              Tel.    (212) 637-2525
                              Fax     (212) 637-2730
                              ilan.stein@usdoj.gov

# Exhibit C



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE SECRETARY

---

*In the Matter of*

**NAVIENT CORPORATION**                     **Docket No. 16-42-SA**

                                   Federal Student Aid Proceeding

                                   CAN:  ED-OIG/A0310006

Respondent.

---

## DECISION OF THE SECRETARY[1]

Navient Corporation (Navient) has appealed the March 7, 2019, decision (Decision) by Administrative Judge Robert G. Layton of the U.S. Department of Education (Department) Office of Hearings and Appeals (OHA).  At issue in this case is the eligibility of student loans for "special allowance payment" (SAP)—payment made by the Department to lenders of certain student loans under the Federal Family Educational Loan (FFEL) Program.  In the Decision, the administrative judge affirmed in part a September 25, 2013, final audit determination (FAD) issued by the office of Federal Student Aid (FSA).[2]  The FAD relied on the Department's Office of Inspector General audit report issued on August 3, 2009 (OIG Report), finding that Navient erroneously charged the Department approximately $22.3 million for SAP on loans that were not eligible for it.[3]

Based on the following analysis, I affirm the administrative judge's Decision.

---

[1] Secretary of Education Betsy DeVos resigned as Secretary effective January 8, 2020.  In accordance with 20 U.S.C. § 3412(a)(1), which states in pertinent part ". . . in the event of a vacancy in the office of the Secretary, the Deputy Secretary shall act as Secretary," Deputy Secretary Mitchell M. Zais began his service as the Acting Secretary upon the vacancy.

[2] Through the FAD, FSA bifurcated this matter into two parts.  First, FSA determined that Navient collected overpayments from the Department through misapplication of the rules discussed later in this opinion.  This part of the controversy became the subject of this appeal to OHA.  Second, FSA required Navient to conduct an audit to determine the actual amount of its liability to the Department.  This second matter is neither final nor ripe for appeal. Therefore, the second matter was not before OHA and will not be resolved in this Decision.

[3] The FAD was issued to Sallie Mae, Inc., but in the interest of simplicity, I refer to Navient, which is Sallie Mae's successor and the party appealing the FAD.  The FAD was based on the OIG Report, Navient's response to the OIG Report, Navient's responses to questions posed by FSA, additional material included with the OIG Report, and relevant public filings.  FAD Cover Letter at 1.

<u>Applicable Law</u>

The terms of SAP as they pertain to this case are explained in the OIG Report:

> A lender participating in the FFEL Program is entitled to a quarterly SAP for loans in its portfolio. In general, the amount of a special allowance payment is the difference between the amount of interest the lender receives from a borrower or the government and the amount that is provided under requirements in the [Higher Education Act].
>
> …
>
> The Education Amendments of 1980 (Pub. L. 96-374) created a separate special allowance calculation for FFEL Program loans made or purchased with proceeds of tax-exempt obligations, and the Higher Education Amendments of 1992 (Pub. L. 102-325) continued this separate calculation for loans with variable interest rates.[4]

Congress created the SAP to subsidize affordable student loans during a period of high inflation. However, Congress did not intend for lenders to receive a windfall, and limited the SAP rates to one-half of the normal rate (with a 9.5 percent floor) in 1980.[5]

The 9.5 percent floor was established "for holders of loans which were made or purchased with funds obtained by the holder from the issuance of obligations, the income from which is exempt from taxation . . . ."[6] Congress sought to balance the need for an equitable return to lenders with the danger of a windfall of SAP for lenders who financed loans with tax exempt obligations.[7] In a Senate report from 1980, Congress stated:

> The past few years have seen a substantial increase in the issuance of tax-exempt bonds for student loan purposes. These bonds are often issued at interest rates significantly lower than commercial rates, since they are State obligations or otherwise qualified for tax-exempt status. However, the special allowance paid on such bonds has been identical with that paid commercial lenders . . . . [U]nforseen amounts of special allowances have been paid to holders of loans which resulted from tax-exempt issuances, providing a return far in excess of the cost of administration or the cost of obtaining the capital. The Committee bill seeks to prevent this windfall by limiting the special allowance on loans made or purchased by tax-exempt funds.[8]

As long-term interest rates on the open market continued to drop, Congress further sought to limit the potential for a windfall. In the Student Loan Reform Act of 1993, Congress repealed

---

[4] OIG Report at 3–4.
[5] This half-SAP rate with a 9.5 percent floor is hereafter referred to as the "9.5 percent floor."
[6] 20 U.S.C. § 1087-1(b)(2)(D)(i).
[7] *Compare* 20 U.S.C. § 1087-1(a) ("assure (1) that the limitation on interest payments or other conditions (or both) on loans made or insured under this part, do not impede or threaten to impede the carrying out of the purposes of this part . . . or do not cause the return to holders of loans to be less than equitable . . . ."), *with* Sen. Rep. No. 96-733, 96th Cong. 2d Sess. 36 (May 25, 1980).
[8] Sen. Rep. No. 96-733, 96th Cong. 2d Sess. 36–37 (May 25, 1980).

the 9.5 percent floor for tax-exempt obligations in a statutory section entitled "Elimination of
Tax-Exempt Floor."[9]  Thus, the 9.5 percent floor did not apply to loans "which are financed with
funds obtained by the holder from the issuance of obligations originally issued on or after
October 1, 1993 . . . [or loans] which were made or purchased with funds obtained by the holder
from collections or default reimbursements on, or interest or other income pertaining to, eligible
loans made or purchased with funds described in the preceding sentence of this subparagraph or
from income on the investment of such funds."[10]

Over the years, the Department has issued several Dear Colleague Letters (DCL)
addressing the 9.5 percent floor as it pertains to this case.[11]  In 1993, the Department issued DCL
93-L-161.[12]  In that letter, the Department described the major changes to the FFEL Program
made by the Student Loan Reform Act of 1993:  "The minimum special allowance rate 'floor' on
new loans made or purchased, in whole or in part, with funds derived from tax-exempt
obligations has been repealed.  Accordingly, loans made or purchased with funds obtained by the
holder from the issuance of obligations *originally* issued **on or after October 1, 1993** . . . no
longer qualify to receive the minimum special allowance."

On March 1, 1996, the Department issued DCL 96-L-186,[13] which stated:

> Under the regulations, if a loan made or acquired with the proceeds of a[n] [eligible]
> tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the
> loan remains subject to the tax-exempt special allowance provisions if the authority
> retains legal interest in the loan.  If, however, the original tax-exempt obligation is
> retired or defeased, special allowance is paid based on the rules applicable to the
> new funding source (taxable or tax-exempt).

In January 2007, the Department issued DCL FP-07-01, defining two categories of
FFELP loans:  "first-generation loans" and "second-generation loans."  First-generation loans are
those acquired using proceeds of tax-exempt obligations (funds obtained directly from the
issuance of the tax-exempt obligation).[14]  Second-generation loans are those acquired using
funds obtained directly from first-generation loans.[15]  The letter went on to explain:

> Funds obtained as collections on second-generation loans, interest and special
> allowance payments on second-generation loans, or sales of second-generation
> loans, or those same kinds of funds obtained from later generation loans, are not
> eligible sources of funds under the statute or regulation.  Therefore, loans acquired
> with funds from second-generation loans or later generations of loans are not
> eligible for SAP at the 9.5 percent minimum return rate.[16]

---

[9] Omnibus Reconciliation Act of 1993, Pub. L. No. 103-66, Sec. 4105 codified at 20 U.S.C. § 1087-1(b)(2)(B)(iv).
[10] 20 U.S.C. § 1087-1(b)(2)(B)(iv).
[11] A DCL is a guidance document issued by the Department to potentially affected parties.
[12] DCL 93-L-161 (Nov. 1993).
[13] DCL 96-L-186 (Mar. 1996).
[14] DCL FP-07-01 at unpaginated (unp.) 2.
[15] *Id*.
[16] *Id*.

On January 24, 2007, the Department sent a letter specifically to Navient similarly describing first-generation and second-generation loans.[17] That letter explains the Department's intent to only pay SAP at the 9.5 percent floor after review of Navient's holdings by an independent accounting firm and an accompanying certification from Navient executives certifying that the 9.5 percent floor is being charged only for first-generation or second-generation loans. The letter also indicates that the Department "will not seek to recoup SAP already received in excess of that payable at the standard rate for quarters ending on or before September 30, 2006 at the 9.5 percent minimum return rate for loans that were neither first-generation loans nor second-generation loans for those lenders that promptly comply with" FSA's requirements as described in the letter.

With the applicable legal foundation established, I now review the factual background of this case.

### Background

This appeal presents a history of financial institutions and their transactions which is recounted in the Decision under appeal and in the parties' briefs. Because this background is germane to the legal issues presented, I repeat it here in relevant part.

Navient's involvement in this matter derives from its acquisition of various subsidiary entities, in particular, the Student Loan Marketing Association (Sallie Mae, or SLMA).[18] Congress chartered Sallie Mae in 1972, as a government-sponsored enterprise, to provide a secondary market for student loans at a time when students had difficulty finding banks to lend.[19] Sallie Mae loans were originated from the FFEL Program.[20]

Over the years, Sallie Mae moved towards privatization.[21] In 1983, Sallie Mae became a publicly-owned corporation with shares listed on the New York Stock Exchange.[22] In 1992, Congress allowed Sallie Mae to convert all of its stock to voting stock.[23] By 1996, Sallie Mae received permission for its shareholders to choose to either reorganize into a private company or liquidate the company.[24] The shareholders chose to reorganize.[25] In 2004, Sallie Mae became

---

[17] *Compare* FSA Ex. ED-08 (Blank Form Letter dated Jan. 24, 2007 (specifically addressing the content of DCL FP-07-01 for an individual entity)) *with* Respondent Ex. R-11 (Letter from Sallie Mae to U.S. Dep't of Educ. dated Feb. 15, 2007 (acknowledging the content of the Jan. 24, 2007 letter and purporting to reserve Sallie Mae's rights to contest the terms of the letter in the future) *and* Navient Brief at 28–34 (asserting that Navient received a copy of the Jan. 24, 2007 letter and "accepted it" by submitting its Feb. 15, 2007 letter).

[18] Navient Brief at 1.

[19] Lessons Learned from the Privatization of Sallie Mae, Office of Sallie Mae Oversight, U.S. Department of the Treasury, March 2006 (Treasury Sallie Mae Report) at 2; Decision at 1; OIG Report at 3.

[20] OIG Report at 3.

[21] According to Department of the Treasury, "SLMA wanted to privatize because of (1) uncontrolled political risk, (2) a desire for more freedom to adapt to changing technology and business realities, which included a diminished GSE funding advantage and (3) SLMA's opportunistic spirit and its view that privatization was now feasible." Treasury Sallie Mae Report at 18.

[22] Id. at 2, 7.

[23] *Id*.

[24] *Id*. at 8–9.

[25] *Id*. at 7, 9.

an entirely private corporate entity, with the primary business of originating and holding student loans.[26]

By the time OIG issued its report in 2009, it referred to the entity in question as "Sallie Mae, Inc. (SLMA)."[27]  Meanwhile, Navient indicated that SLM Corporation, also described as "Old SLM," constituted various consolidated subsidiaries, which eventually changed its name to "Navient, LLC" and then was merged into Navient, "with Navient as the surviving corporation."[28]  In its fiscal year 2014 Form 10-K filing with the Securities and Exchange Commission, Navient indicated that it became an independent, publicly traded company on the NASDAQ on May 1, 2014.[29]  At that time, Navient asserted that it held "the largest portfolio of education loans insured or guaranteed under the [FFELP], as well as the largest portfolio of Private Education Loans."[30]  Among other ongoing concerns, Navient listed the OIG Audit "related to our billing practices for SAP" and the FAD.[31]

Over the years, Sallie Mae acquired other companies and sub-entities in the student loan industry.  The transactions of two subsidiaries, Nellie Mae[32] and the SLM Education Credit Finance Corporation (ECFC), are the basis of the controversy under appeal as described below.

**Nellie Mae**

Nellie Mae began as a not-for-profit, state-chartered entity acting as a secondary market for student loans originating with banks.  By 1992, Nellie Mae had begun originating student loans.  Of particular relevance to this appeal, in 1993, Nellie Mae created the 1993 Nellie Mae Trust (1993 Trust), which financed five series of unsecured tax-exempt bonds (1993 Bonds) during the period of March 1993 through November 1993.[33]  The 1993 Bonds were issued by the New England Education Loan Marketing Corporation (NEELMC), with a maturity amount totaling $458,095,000.

To acquire loans, Nellie Mae established a common funding pool (1993 Bond Pool) to aggregate proceeds from all the 1993 Bonds.  Within the 1993 Bond Pool, Nellie Mae established two sub-pools:  Sub-pool #1 (related to Bond 1993A) and Sub-pool #2 (related to Bonds 1993B through 1993H).[34]  Nellie Mae used each sub-pool to separately deposit bond

---

[26] OIG Report at 3.
[27] *Id*. at 1.
[28] Navient Corporation, Annual Report (Form 10-K), at 3 (Jan. 31, 2015), available at https://www.sec.gov/Archives/edgar/data/1593538/000119312515070145/d832950d10k.htm.
[29] *Id*.
[30] *Id*.
[31] *Id*. at 34.
[32] The parties in this appeal and the administrative judge refer to "Nellie Mae" as the collective entities titled Nellie Mae Holdings LLC (formerly Nellie Mae Corporation, then Nellie Mae Holdings Corporation), Nellie Mae Education Loan LLC (formerly Nellie Mae Education Loan Corporation), and Nellie Mae Loan Finance, LLC.  In 1998, Nellie Mae divided into the Nellie Mae Education Foundation (an institution making grants and conducting studies regarding education) and the taxable loan-servicing entity called Nellie Mae Corporation.
[33] Navient Brief at 8–9.
[34] *Id*. at 9–10.  As previously mentioned, Nellie Mae established five series of bonds.  Bond 1993A constituted Series #1, Bond 1993B constituted Series #2, Bonds 1993C through 1993F constituted Series #3, Bond 1993G constituted Series #4, and Bond 1993H constituted Series #5.  *Id*. at 9.

proceeds as well as monthly principal and interest payments, guarantor payments, interest benefits and special allowance, and other income from the loans financed by that particular sub-pool.[35]

### ECFC

Nellie Mae incorporated NM Education Loan Corporation on July 27, 1999, which was renamed SLM Education Credit Management Corporation on July 22, 2002, then later renamed to ECFC on November 10, 2003.[36]  ECFC was wholly owned by Sallie Mae.[37]

As of 2004, Nellie Mae held a certain bundle of loans with a principal value of approximately $688.6 million.[38]  Nellie Mae identified these loans as eligible for the 9.5 percent floor because they were funded through Bond 1993F.[39]  In July of 2004, Sallie Mae sold these loans from its subsidiary Nellie Mae to its other subsidiary, ECFC.[40]  After the sale, ECFC reclassified the loans as eligible for the full SAP without the 9.5 percent floor.[41]  Later, Sallie Mae considered "the July 2004 sale" to be "an erroneous early liquidation of bond series 93F."[42] Between January and June 2005, Sallie Mae revised its billings with regard to these loans to instead charge SAP at the 9.5 percent floor.[43]

<u>OIG Report</u>

I now turn to the OIG Report to determine whether the foregoing activities of Navient's subsidiaries complied with the applicable law.  OIG issued its final audit report on August 3, 2009.  Navient's liability stems from the overbilling of loans held by Nellie Mae and ECFC, each separately discussed below.

### Nellie Mae Overpayments

OIG found that Sallie Mae's subsidiary, Nellie Mae, erroneously billed certain 1993 Bonds (collectively referred to as Nellie Mae's 93A Indenture) at the 9.5 percent floor "after the eligible tax-exempt bonds, from which the loans derived their eligibility for the 9.5 percent floor, had matured and been retired, and after the loans were refinanced with funds derived from ineligible sources."[44]  Specifically, Bond 1993B matured on June 1, 2002, Bond 1993F matured on July 1, 2004, Bond 1993G matured on August 1, 2002, and Bond 1993H matured on December 1, 2002.[45]  Nevertheless, OIG found:

---

[35] *Id.* at 9–10.
[36] OIG Report at 3.
[37] *Id.*
[38] *Id.* at 10.
[39] *Id.*
[40] *Id.*
[41] Decision at 6.
[42] OIG Report at 40.
[43] *Id.*
[44] *Id.* at 1, 8.
[45] *Id.* at 8.

SLMA had a long-standing practice of continuing to bill loans under the 9.5 percent floor calculation until the last bond associated with the indenture matured.  In this instance, SLMA treated loans made eligible for the 9.5 percent floor calculation by each of the bonds, issued under the 93A Indenture, as remaining eligible for the 9.5 percent floor calculation until Bond 93A matured on July 1, 2005.

…

SLMA explained that all of the individual bonds issued under the 93A Indenture shared common characteristics.  For example, all of the bonds had identical terms and were payable from the same source of funds.  SLMA considered it reasonable to treat all of the bonds issued under the 93A Indenture as a single "obligation," and to consider that obligation to mature only when its last bond matured.[46]

OIG determined that Sallie Mae's usage of the 9.5 percent floor in this case did not comport with the Higher Education Act (HEA) and Department regulations.[47]  OIG pointed out that the "date the obligation is refunded" and "[t]he date the obligation matures, is retired or defeased" are characteristics of an obligation that are material to determine the obligation's eligibility for the 9.5 percent floor calculation.[48]  OIG pointed out that the various bonds in the 93A Indenture have different maturity dates.[49]  OIG asserted that the term "obligation" in the HEA, regulations and other guidance "plainly refers to a bond, not the bond's indenture."[50]  Thus, the eligibility of each bond for the 9.5 percent floor must be separately determined, regardless of the fact that the bonds were aggregated into a single pool of bonds.[51]  OIG estimated that Sallie Mae overcharged approximately $10 million in interest in the form of erroneous SAP calculations.[52]

Sallie Mae provided responses in the form of comments to OIG, and FSA posed questions which Sallie Mae answered in 2010 and 2011.  Sallie Mae contended that OIG erroneously interpreted the word "obligation" as used in 34 C.F.R. § 682.302(e)(2).  That regulation reads as follows:

(2) Effect of Refinancing on Special Allowance Payments. Except as provided in paragraphs (e)(3) through (e)(5) of this section -

(i) The Secretary pays a special allowance at the rate prescribed in paragraph (c)(3) of this section to an Authority that holds a legal or equitable interest in the loan that is pledged or otherwise transferred in consideration of -

(A) Funds listed in paragraph (c)(3)(i) of this section;

(B) Proceeds of a tax-exempt refunding obligation that refinances a debt that -

---

[46] *Id*. at 9.
[47] *Id*. at 10 (citing HEA § 438(b)(2)(B)(v)).
[48] *Id*. (citing Section 438(b)(2)(B)(iv) of the Higher Education Act).
[49] *Id*.
[50] *Id*.
[51] *Id*.
[52] *Id*. at 9.

7

(1) Was first incurred pursuant to a tax-exempt obligation originally issued prior to October 1, 1993;

(2) Has been financed continuously by tax-exempt obligation.

(ii) The Secretary pays a special allowance to an Authority that holds a legal or equitable interest in the loan that is pledged or otherwise transferred in consideration of funds other than those specified in paragraph (e)(2)(i) of this section either -

(A) At the rate prescribed in paragraph (c)(1) of this section, if_

(1) The prior tax-exempt obligation is retired; or

(2) The prior tax-exempt obligation is defeased by means of obligations that the Authority certifies in writing to the Secretary bears a yield that does not exceed the yield restrictions of section 148 of the Internal Revenue Code and the regulations thereunder, or

(B) At the rate prescribed in paragraph (c)(3) of this section.

Sallie Mae argued an "obligation" under 34 C.F.R. § 682.302(e)(2)(ii)(A) should collectively refer to "all bonds subject to a single indenture (or, here, a single Trust Agreement)," which would allow them all to remain eligible for the 9.5 percent floor while any of the associated bonds remain outstanding.[53]

### ECFC Overpayments

For the purposes of its audit, OIG presumed that the loans sold by Nellie Mae to ECFC qualified for the 9.5 percent floor because of Bond 1993F's tax-exempt eligibility.[54]  According to OIG, Nellie Mae sold the loans "in consideration of funds derived from ineligible sources" and, thereafter, "ceased billing the loans under the 9.5 percent floor calculation."[55]  Bond 1993F matured on July 1, 2004, at which time it was repaid and retired.[56]  In February of 2005, Sallie Mae recoded the loans held by ECFC as eligible for the 9.5 percent floor.  Sallie Mae retroactively adjusted billing for the last two quarters of calendar year 2004 and adjusted its billing in the first two quarters of 2005 to utilize the 9.5 percent floor calculation.[57]

OIG questioned Sallie Mae's recoding and billing for these loans.  Sallie Mae subsequently provided additional material—761 pages of documentary evidence and responses to questions posed by FSA—defending the billing related to the loans sold by Nellie Mae to

---

[53] FSA Determination at 5.
[54] OIG assumed the original eligibility of the loans for the 9.5 percent floor for the purposes of this proceeding. However, OIG did not actually perform an audit to make such a determination.  OIG Report at 10, n.6.
[55] *Id*. at 10.
[56] *Id*. at 11.
[57] *Id*.

ECFC in July 2004.[58]  However, OIG found that Sallie Mae erroneously overbilled for these loans, resulting in an estimated $12.3 million of overpayments for which Navient is liable.[59]

## FSA Final Audit Determination

On September 25, 2013, FSA issued the FAD to Navient.  FSA agreed with OIG's interpretation of the amendment to the HEA removing the 9.5 percent floor.[60]  FSA determined that the "obligation" cited by the law is each particular bond, not an aggregate bond pool.  FSA pointed to language used in the *Federal Register* in 1985 publishing regulations at 34 C.F.R. § 682.302(e) as evidence that an obligation means "the 'source of funds' used to acquire or maintain the Authority's interest in 'a loan.'"[61]  FSA held that Sallie Mae's interpretation of an "obligation" as a group "of bonds that share certain characteristics" would have "frustrated the stated purpose of § 682.302(e)."[62]

FSA reiterated that proceeds from each bond lose their tax-exempt status as the bonds become retired.[63]  Therefore, FSA concluded that Sallie Mae erroneously charged SAP at the 9.5 percent floor associated with Bonds 1993B, 1993G, and 1993H.  Also, FSA found that ECFC did not satisfy the definition of an "Authority" under the HEA such that it was eligible to charge the 9.5 percent floor for loans associated with Bond 1993F.[64]  ECFC failed to qualify as an Authority because it "never had power to issue tax-exempt bonds" and was not a qualifying "successor" to "a qualified student loan funding corporation."[65]  Thus, ECFC's SAP billings for loans associated with Bond 1993F from September 30, 2004, to June 30, 2005, were erroneous overpayments.[66]

The effect of the FAD was to require Sallie Mae to identify loans associated with Bonds 1993B, 1993F, 1993G, and 1993H to determine the adjusted billings made for each loan during periods after which the bonds became ineligible for SAP payments.[67]  FSA also required Sallie Mae to disclose other instances of its subsidiaries billing SAP at the 9.5 percent floor for ineligible loans.[68]  The FAD bifurcated the matter between the question of liability and the amount of liability.[69]  The FAD became an appealable ruling on the question of liability, as FSA held Sallie Mae liable for overpayments based on its interpretation of the rules governing SAP.

---

[58] FSA Determination at 6.

[59] OIG Report at 11.

[60] FSA Determination at 3, 12–19.

[61] *Id*. at 14.

[62] *Id*. at 15.

[63] *Id*. at 19.

[64] *Id*.

[65] *Id*.

[66] *Id*. at 19–23.

[67] *Id*. at 23.

[68] *Id*.

[69] Under 34 C.F.R. 668 Subpart H, third party servicers may appeal a "final audit determination or a final program review determination arising from an audit or program review of the institution's participation in any Title IV, HEA program or of the servicer's administration of any aspect of an institution's participation in any Title IV, HEA program."  34 C.F.R. § 668.111.

However, as stated earlier, the precise amount of liability remained unresolved pending the further accounting required of Sallie Mae by FSA.[70]

OHA Appeal

On July 27, 2016, Sallie Mae's parent entity Navient Corporation filed an appeal of the FAD with OHA.[71]  The scope of the appeal was limited to the question of whether Navient was liable for overpayments of SAP on loans funded by the bonds reviewed in the OIG report for the period following June 1, 2002.[72]

The administrative judge considered three questions on appeal[73]:

1. Was Navient's financing, with loans acquired in whole or in part with tax-exempt funds, entitled to receive payments at the 1/2 SAP rate during the periods of the audit?

2. Was Navient's treatment by FSA notably inconsistent with other industry participants?

3. Is Navient liable in this proceeding for other potentially similar overbillings pertaining to 1/2 SAP rate claims for the period before June 1, 2002?

On the first question, the administrative judge agreed with OIG and FSA that Navient was not entitled to the 9.5 percent floor, making it liable for the overpayment of SAP.  The administrative judge found Navient's theory that it correctly charged the 9.5 percent floor for loans partly funded from taxable sources "stems solely from DCL 93-L-161."[74]  Despite the language "in whole or in part" in the DCL, the administrative judge found the language of the statute "clear and unambiguous" in limiting the 9.5 percent floor to loans made solely with tax-exempt funds.[75]  The administrative judge considered Navient's interpretation of the legal authority to create a "nearly unlimited exception" that "turned upside down" Congress's purpose and "negates the entire statute."[76]

On the second question, the administrative judge rejected Navient's argument that it was treated unfairly and disparately from its industry competitors.  Navient claimed that FSA's actions sought to punish it while FSA chose not to enforce the same rules against competitors.  Citing a lack of evidence presented by Navient to support its arguments, the administrative judge found that "Navient has not shown other similarly-situated industry participants who received

---

[70] "'FSA will issue a separate determination solely on the amount of overpayments and the adequacy of any other actions taken to implement the directions in this letter.'"  Decision at 2 (quoting September 25, 2013 Letter from Department of Education to Sallie Mae, Inc. at 3).
[71] Decision at 2.
[72] *Id*. at 4, 19.
[73] *Id*. at 4.
[74] *Id*. at 12.
[75] *Id*. at 13.
[76] *Id*.

10

different treatment" and "Navient has not met its threshold showing that FSA singled it out."[77]
Thus, Navient did not meet the "'rigorous threshold standard'" to overcome the presumption of
regularity that an administrative body has discharged its duties correctly.[78]

On the third question, the administrative judge found his decision to be limited to the
scope of the issues from the FAD, which itself was limited to the period following June 1,
2002—thus, he made no ruling on any overbillings made prior to June 1, 2002.[79]

The administrative judge affirmed the FAD, finding Navient liable to repay all amounts
covered by the scope of the OIG Audit.[80]  Navient's subsequent appeal of the administrative
judge's Decision is now before me.

<u>Analysis</u>

On appeal, Navient argues several issues.  First, Navient asserts that it correctly charged
SAP for the Nellie Mae loans, both because it followed binding departmental guidance and
because its entire 1993 Bond Pool constituted a single obligation.  Second, it argues it correctly
charged SAP for the ECFC loans.  Third, it argues that DCL FP-07-01 constituted a binding
settlement agreement between Navient and the Department which shields Navient from any
liability for overcharging SAP in this matter.  Fourth, it argues that the findings of liability in the
FAD are barred by the statute of limitations.  Finally, it argues that it is prejudiced by the
bifurcation of these proceedings at a lower level and urges me to reach beyond the administrative
judge's Decision by creating a final calculation of its liability.  Below I address each of these
arguments in turn.

**Nellie Mae Overpayments – The Dear Colleague Letter**

Navient argues that the Department made a binding legal determination when it issued
DCL 93-L-161.  Navient contends that the language "in whole or in part" means that loans
funded in any part with tax-exempt obligations are entirely subject to the 9.5 percent floor.
Furthermore, Navient asserts it was required to charge SAP for all such loans at the 9.5 percent
floor because DCL 93-L-161 constituted the Department's official interpretation of the statute.[81]

First, I reject Navient's argument that DCL 93-L-161 created new, controlling legal
authority.  A DCL is, at most, an interpretive rule, not a regulation subject to the notice-and-
comment rulemaking process under the Administrative Procedure Act.  The Supreme Court has
held:

---

[77] *Id*. at 16.

[78] *Id*. (quoting *In the Matter of Microcomputer Tech. Inst. (On Remand)*, Dkt. No. 94-88-SA, U.S. Dep't of Educ.
(May 20, 2002) at 4).

[79] *Id*. at 18–19 ("The regulations have been recognized to require that 'a Subpart H proceeding is a necessarily
limited administrative forum wherein an institution may challenge a final audit or program review determination that
finds that an institution fails to meet a statutory and regulatory requirement and, as a result, owes a liability to the
federal government.'") (citing *In re Int'l Junior Coll.*, Dkt. No. 07-52-SA, U.S. Dep't of Educ. (Decision of the
Secretary) (Nov. 19, 2010); *In re Microcomputer Tech. Inst.*, Dkt. No. 94-88-SA).

[80] *Id*. at 19.

[81] Navient Brief at 7–8, 19–20.

The absence of a notice-and-comment obligation makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules. But that convenience comes at a price:  Interpretive rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory process."[82]

The Department previously considered the question of whether pronouncements in a DCL constitute binding legal rules.  *MBTI Business Training Institute of Puerto Rico* presented the case of an institution found liable to the Department for overstating the total clock hours of instruction for its programs.[83]  The appellant and the Department disagreed on the issue of how many minutes constitute a clock hour under the regulation in effect at the time, 34 C.F.R. § 668.2 (1991).[84]  While the institution relied only on the definition in that regulation, "ED relie[d] upon a June 1985 Dear Colleague Letter (Gen-85-12) as authority for the proposition that an institution cannot divide the total number of minutes of instruction in a day by 50 minutes to determine the number of clock hours in that day."[85]  The presiding administrative law judge applied to this case the same legal analysis used in a previous case, *Denver Paralegal Institute*,[86] to establish the non-binding nature of the Student Financial Aid Handbook.  The administrative law judge held that because a DCL is not subject to the notice and comment procedures of the Administrative Procedure Act, it is not binding on third parties, and where departmental policies conflict with the language of a regulation, the policies may be disregarded.[87]  The decision was certified on appeal by then-Secretary of Education Richard Riley on June 9, 1995.[88]

The analysis essential to Navient's case is the language of the controlling statute and duly promulgated regulations.  Policy guidance in the form of a DCL may be helpful in implementing new rules, but such guidance cannot conflict with laws established by Congress or regulations enacted through the rulemaking process.

DCL 93-L-161 states that its purpose is "to provide the student loan community with information on the major program changes mandated by [the Omnibus Budget Reconciliation Act of 1993 (Pub. L. 103-66]."[89]  It contains brief sections spanning 14 pages summarizing "[n]umerous changes affecting the [FFEL] Program" and the newly "established requirements for the transition of the FFEL Program to the Federal Direct Student Loan (FDSL) Program."[90]  The letter does not purport to offer a detailed summary of the pre-amendment statutory

---

[82] *Perez v. Mortgage Bankers' Ass'n*, 575 U.S. 92, 97 (2015) (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)).

[83] *In the Matter of MBTI Bus. Training Inst. of Puerto Rico*, Dkt. No. 93-147-SA, U.S. Dep't of Educ. (Apr. 15, 1994) at 1.

[84] *Id*. at 2–3.

[85] *Id*. at 3.

[86] *In re Denver Paralegal Inst.*, Dkt. Nos. 92-86-SP and 92-87-SA, U.S. Dep't. of Educ. (Mar. 14, 1994).

[87] *In the Matter of MBTI Bus. Training Inst. of Puerto Rico*, Dkt. No. 93-147-SA at 3–4.

[88] *See Southeastern Univ.*, Dkt. No. 93-40-ST, U.S. Dep't of Educ. (Sept. 20, 1996) at 4–5 (holding that an Institutional Review Branch policy memorandum, like a Dear Colleague Letter or the preamble to a regulation published in the *Federal Register*, "are not binding since these pronouncements have not been subject to the notice and comment procedures of the Administrative Procedure Act."); *see also In re Denver Paralegal Inst.*, Dkt. Nos. 92-86-SP and 92-87-SA.

[89] DCL 93-L-161.

[90] *Id*.

framework and does not show any intent by the Department to offer a new and unique interpretation of how the Department must apply the 9.5 percent floor.  Rather, it indicates it "provide[s] . . . information on the major program changes" and states that "some changes are self-implementing and supersede current regulations" while "other changes will require that new regulations be published."[91]

The sentence at issue appears on page 13.  Navient asserts that this sentence constitutes the Department's new and binding interpretation of the law allowing the 9.5 percent floor to be billed on obligations funded partially with tax-exempt and partially with taxable funds.  I am unpersuaded that the Department had any intention of hiding a new legal interpretation in a clause in the middle of an otherwise innocuous sentence on the thirteenth page of DCL 93-L-161.  I agree with FSA's position and the administrative judge's holding that DCL 93-L-161 did not and could not establish a binding legal position of the Department that conflicts with the existing statute and regulations.

Therefore, my analysis turns to the applicable statute and regulations.  As Congress evolved the language in the HEA, it consistently described loans qualifying for the 9.5 percent floor as funded by tax exempt obligations, without any provision for loans to be funded "in part" by tax exempt obligations.[92]

I find that allowing loans funded "in part" by tax exempt obligations to qualify for the 9.5 percent floor is improper on multiple grounds.  First, Congress eliminated the 9.5 percent floor in 1993 based on the lending environment and available interest rates at the time.  Allowing comingled loan pools to incorporate a small number of loans funded by tax exempt obligations to qualify all of the loans for the 9.5 percent floor would provide an enormous windfall at the expense of the government and contrary to the intent of Congress.  Second, Congress set an October 1, 1993, end-date for the issuance of obligations that would generate tax exempt revenue.  Allowing comingled loan pools to incorporate a small number of loans issued just prior to that end date would allow loans originally funded by defeased bonds to continue receiving SAP at the 9.5 percent floor for months or years after they ceased to qualify, also contrary to the intent of Congress.  Finally, the DCL suggests no intent by the Department to offer a new, unique interpretation of the statute or regulations, nor offers any reasoning for such an interpretation.  Even if it purported to do so, a DCL does not have the force and effect of law.  Under past departmental precedent discussed above, a DCL is properly disregarded when it conflicts with a statute or regulation.

Navient's theory on this issue rests solely on the cited clause in DCL 93-L-161, but its theory conflicts with the statutory language, the Department's associated regulations, past departmental decisions, and Congressional intent.  Accordingly, I reject Navient's argument regarding the legal effect of DCL 93-L-161.

---

[91] *Id*.

[92] 20 U.S.C. § 1087-1(b)(2)(B)(i) (applying the 9.5 percent floor to loans "made or purchased with funds obtained by the holder from the issuance of obligations, *the income from which is exempt from taxation*") (emphasis added).

### Nellie Mae Overpayments – The Definition of Obligation

Navient also argues that the 1993 Bond Pool's "structure was unique," which justified treating all the aggregated bonds as a single obligation.[93] This structure "*required* Nellie Mae to claim special allowance at the 1/2 SAP Rate as long as any bond within its 1993 tax-exempt financing remained outstanding."[94] FSA argues that the plain meaning of obligation is the smallest unit of debt, in this case each individual bond.[95] The 1985 version of the regulations defined obligation as "'any interest-bearing debt . . . issued to acquire funds for . . . making or purchasing of student loans.'"[96]

The common legal definition of a bond is "An obligation; a promise."[97] The terms bond and obligation are effectively synonymous under the law, which is reinforced in this context by the 1985 regulatory definition of an "interest-bearing debt" cited by FSA above. Regardless of the commonalities cited by Navient, the bonds in the 1993 Bond Pool are not a singular bond, which means they do not constitute a singular obligation. The 1993 Bond Pool is an aggregate of multiple bonds, each issued under its own terms and with separate maturity dates, securing repayment of separate debts. No matter how similar—even identical—these terms are, the bonds are issued under separate instruments and are separate obligations. Therefore, I reject Navient's argument and affirm the administrative judge's Decision regarding the Nellie Mae overpayments.

### ECFC Overpayments

Navient argues that it correctly charged SAP at the 9.5 percent floor for loans transferred from Nellie Mae to ECFC in 2004. Navient's theory is based on its interpretation of the Internal Revenue Code at I.R.C. § 150(d)(3)(B), specifically that the administrative judge erred in applying this provision to the case before him. Instead, Navient asserts that the transferor Nellie Mae and transferee ECFC were not separate entities for federal income tax purposes.[98]

Navient's arguments regarding the transfer to ECFC are undercut by the fact that the underlying Bond 1993F matured on July 1, 2004. As discussed above, the eligibility for the 9.5 percent floor is determined for each obligation, in this case Bond 1993F. The continued existence of the larger bond pool is irrelevant to the fact that Bond 1993F was retired. If Bond 1993F was retired, the structure of the sale of the loans and legal status of the successor in interest are rendered moot. Because the loans lost eligibility for the 9.5 percent floor in July 2004 when the bond matured, any billing of SAP at the 9.5 percent floor after July 2004 would be an overbilling, regardless of which entity owned them or how they were transferred. Navient makes no argument to contradict this conclusion. Based on this fact alone, I affirm the administrative judge's Decision on the loans transferred to ECFC.

---

[93] Navient Brief at 24.
[94] *Id*.
[95] FSA Brief at 19.
[96] *Id.* (quoting 34 C.F.R. § 682.801 (1985)).
[97] Bond, *Black's Law Dictionary* (11th ed. 2019).
[98] Navient Brief at 35 (indicating that the loans were held by NMELC, the obligor on the 1993 Bonds, which transferred them past Nellie Mae Holdings, its sole member, to the sole member of Nellie Mae Holdings, ECFC, and that each of these entities were single member limited liability companies).

### The 2007 Dear Colleague Letter

Navient alternatively argues that its liability in the matter is barred by a binding settlement agreement it made with the Department in 2007.[99]  Navient construes the January 24, 2007, letter as a binding contractual offer to "broadly forego enforcement action . . . if a lender adopted the Department's new standard policy on a prospective basis."[100]  On February 15, 2007, Navient sent a letter back to the Department expressing its intent to cease prospective billing at the 9.5 percent floor.[101]  Navient construes its response letter as a binding contractual acceptance.[102]

The Department refutes Navient's argument, stating that DCL FP-07-01 only served to withhold collections for overpayments on loans that were neither first-generation loans nor second-generation loans.[103]  This stated intent by the Department to withhold certain collections for overpayments does not apply to overpayments on first-generation loans or second-generation loans made after the tax-exempt bond expired and the loans no longer qualified for the 9.5 percent floor.[104]

I agree with FSA.  As discussed at length above, a Dear Colleague letter is a mechanism to provide guidance on existing laws and regulations, not to establish new rules.  DCL FP-07-01 does not have the force or authority of a statute or regulation, it has no power to obviate the enforcement of such laws, and it does not establish a binding and enforceable contract between the Department and Navient to waive the liability established in the OIG Audit.[105]  Furthermore, DCL FP-07-01 and the follow up letter of January 24, 2007, specifically indicate the Department's intent to forego collection on a narrow set of overpayments.  The overpayments at issue in the present appeal are on first-generation and second-generation loans, so the Department's stated intent to not collect does not apply to these overpayments.  Accordingly, I reject Navient's argument that FSA's decision is barred by an existing settlement agreement.

### The Statute of Limitations

Next, Navient argues that the statute of limitations at 28 U.S.C. § 2462 bars collection of the overpayments at issue in this case.[106]  That statute bars assessment of civil fines and forfeitures after 5 years from the date the basis of the violation accrued, meaning the date when the fineable activity first took place.[107]  Navient asserts that collection of the overpayment in this

---

[99] Navient Brief at 28.

[100] *Id*.

[101] *Id*. at 30.

[102] *Id*.

[103] FSA Brief at 30.

[104] *Id*. at 31.

[105] *Supra* at 11–13 and cases cited.

[106] Navient Brief at 40.

[107] *Gabelli v. SEC*, 568 U.S. 442, 448 (2013) ("'In common parlance a right accrues when it comes into existence....' *United States v. Lindsay*, 346 U.S. 568, 569, 74 S.Ct. 287, 98 L.Ed. 300 (1954).  Thus the 'standard rule' is that a claim accrues 'when the plaintiff has a complete and present cause of action.' *Wallace v. Kato*, 549 U.S. 384, 388, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007) (internal quotation marks omitted); *see also*, *e.g.*, *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997); *Clark v. Iowa City*, 20 Wall. 583, 589, 22 L.Ed. 427 (1875).").

case would be a "stale claim" that could be pursued for "money disbursed fifty years ago or more."[108]  Without enforcement of a time limit here, Navient argues that its right to due process is violated.[109]  Navient asserts that this case invokes the statute of limitations because collection of the overpayment constitutes a forfeiture, which "'occurs when a person is forced to turn over money or property' due to alleged wrongdoing."[110]

The administrative judge rejected this argument by Navient.  Counsel for FSA supports the administrative judge's ruling, arguing that "recoupment of public funds" does not constitute a "fine, forfeit, or punishment" that would invoke 28 U.S.C. § 2462.[111]  I agree.  The essential component of civil penalty to which 28 U.S.C. § 2462 applies is the punitive nature of the financial sanction.  In this case, repayment merely corrects the original overpayment and is not punitive or discretionary.[112]  Therefore, the statute of limitations at 28 U.S.C. § 2462 that applies to civil fines does not apply to recoupment of the overpaid funds for which Navient is liable.

I also reject Navient's claim that the lack of a statutory time limit for these proceedings denies its right to due process.  The requirement of due process is flexible and calls for such procedural protections as a particular situation demands.[113]  Due process in an administrative proceeding is distinct from due process in a judicial proceeding because courts have recognized that administrative and judicial proceedings are inherently different.[114]  Each administrative proceeding must be carefully assessed to determine what process is due based on the circumstances.[115]  The key provision is some form of hearing that allows the individual a meaningful opportunity to be heard.[116]

In this case, Navient has had the benefit of a full and extensive administrative process through which it had the opportunity to present evidence and argumentation.  The administrative process included OIG's audit, Navient's opportunity to provide comments, issuance of the FAD, the hearing before OHA with the presentation of legal briefs and evidence, and now my review of the OHA decision on appeal.  I find no basis to invent a specific deadline for conclusion of this process where none is provided for in statute or regulation.[117]  Therefore, I reject Navient's arguments related to due process.

### Bifurcation of the Proceedings

---

[108] Navient Brief at 41.

[109] *Id.*

[110] *Id.* (quoting *SEC v. Graham*, 823 F.3d 1357, 1363 (11th Cir. 2016)).

[111] ED Brief at 33.

[112] The Department has well-established precedent that recovery of liability does not constitute a fine and is not punitive in nature.  *In re Salinas Beauty Coll.*, Dkt. No. 18-67-SP, U.S. Dep't of Educ. (Feb. 14, 2020) at 7; *In re Salon and Spa Inst. (TX)*, Dkt. No. 16-23-SP, U.S. Dep't of Educ. (Jan. 18, 2018) at 2; *In re Lincoln Univ.*, Dkt. No. 13-68-SF, U.S. Dep't of Educ. (Decision of the Secretary) (Apr. 25, 2016) at 3, n.3 ("actions to recover funds . . . are purely remedial and not punitive (and therefore not subject to § 2462)").

[113] *Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir. 2013).

[114] *Id.*

[115] *Id.*

[116] *Mathews v. Elridge*, 424 U.S. 319, 333 (1975).

[117] *In the Matter of The Salon and Spa Inst. (TX)*, Dkt. No. 16-23-SP at 5 (declining to impose a time limit for recovering financial liability from an institution of higher education where no time limit is established by law).

Finally, Navient argues that the bifurcated nature of these proceedings prejudices it, causing unnecessary delay without serving any valid goal.[118]  In the event that I affirm the Decision, Navient asks that I dismantle the bifurcation of these proceedings and concurrently decide liability and damages, presumably to accelerate the completion of this controversy in its entirety.[119]

I disagree with Navient that the bifurcation of these proceedings serves no valid goal.  In the FAD, FSA clearly indicates that determining a final calculation of Navient's overpayment will depend upon Navient completing an audit of its records.  In the meantime, this administrative process has addressed the legal conclusions FSA reached in the FAD as to whether Navient is liable at all.  Separating the legal question from the calculation of liability, which would not be necessary if Navient were to prevail, is a valid reason for bifurcation of these proceedings.

Furthermore, I disagree that it would be prudent now to disrupt the bifurcated nature of these proceedings.  To do so would require me to order the parties to submit evidence and briefs on the question of the final liability calculation which, as I stated above, would only be material if I resolved the case before me by issuing a ruling to uphold the Decision.  Additionally, Navient would lose the due process protection of having an initial decision by an administrative judge which is appealable to me within the Department's hearing framework.

Conclusion

Having considered and rejected each of Navient's arguments, I find the administrative judge's Decision well-reasoned and correct in scope.  Therefore, I affirm the administrative judge's Decision on the limited questions of law which he decided.  I also decline Navient's request that I upend the bifurcated nature of the proceedings.

**ORDER**

ACCORDINGLY, the Decision of the administrative judge is AFFIRMED.  Navient is liable to repay FSA for overpayments for the liabilities cited by the administrative judge in his Decision, in which Navient improperly received SAP on loans that were not eligible for the 9.5 percent floor.

Consistent with the language of the FAD, FSA will issue a separate determination on the amount of Navient's liability.  FSA will make such final determination of liability following Navient's compliance with Section VI of the FAD, wherein Navient must—as successor in interest to Sallie Mae—identify loans held by Navient and its subsidiaries for which SAP was overpaid.

---

[118] Navient Brief at 43–45.
[119] *Id*. at 43.

So ordered this 15th day of January 2021.

_____

Mitchell M. Zais, Ph.D.
Acting Secretary

Washington, DC

**<u>Service List</u>**

Colby A. Smith, Esq.
Ada Fernandez Johnson, Esq.
Jil Simon, Esq.
Debevoise & Plimpton LLP
801 Pennsylvania Avenue, NW, Suite 500
Washington, DC  20004

Joshua N. Cohen, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY  10022

Natasha Varnovitsky, Esq.
Office of the General Counsel
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC  20202-2110

# Exhibit E



# SLM Private Education Loan ABS Primer

Private Education Loan Market
SLM's Securitized Private Education Loans
Collections and Loan Policy
Glossary of Terms

# Private Education Loan Market

SallieMae

DRAFT

2



# SLM Securitized Private Education Loan Programs

| | Undergraduate/Graduate/Professional | | Direct-to-Consumer (DTC) | Consolidation | Career Training (CT) |
|---|---|---|---|---|---|
| | Smart Option | Med/Law/MBA | | | |
| **Origination Channel** | School | School | Direct-to-Consumer | Lender | School |
| **Typical Borrower** | Student | Student | Student | College Graduates | Student |
| **Typical Co-signer** | Parent | Parent | Parent | Parent | Parent, Spouse |
| **Typical Loan** | $10k avg orig bal, 10 yr avg term; in-school payments of interest only, $25 or fully deferred | $10k avg orig bal, 15 yr term; deferred payments | $12k avg orig bal, 15 yr term; deferred payments | $43k avg orig bal, 15-30 year term depending on balance; immediate repayment | $10k avg orig bal, up to 15 yr term; immediate payments |
| **Origination Period** | March 2009 to present | All history to present | 2004 through 2008 | 2006 through 2008 | 1998 to present |
| **Certification and Disbursement** | School certified and disbursed | School certified and disbursed | Borrower self-certified, disbursed to borrower | Proceeds to lender to pay off loans being consolidated | School certified and disbursed |
| **Borrower Underwriting** | FICO, Debt-to-Income, custom credit score model, and judgmental underwriting | Primarily FICO; Debt-to-Income since 2008 | Primarily FICO | FICO and Debt-to-Income | FICO, Debt-to-Income and judgmental underwriting |
| **Borrowing Limits** | $200,000 | $100,000 Undergraduate, $150,000 Graduate | $130,000 | $400,000 | Cost of attendance plus up to $6,000 for expenses |
| **Current ABS Securitization Criteria** | For-Profit: FICO ≥ 670 Non-Profit: FICO ≥ 640 | For-Profit: FICO ≥ 670 Non-Profit: FICO ≥ 640 | FICO ≥ 670 | For-Profit: FICO ≥ 670 Non-Profit: FICO ≥ 640 | FICO ≥ 670, school channel only, no loans in school status |
| **School Underwriting** | No | No | No | No | Yes |
| **Historical Risk-Based Pricing** | L + 2% to L + 14% | P -1.5% to P+7.5% L+0% to L+15% | P+1% to P+6.5% L+6% to L+12% | P - 0.5% to P + 6.5% | P+0% to P+9% L+6.5% to L+14% |
| **Dischargeable in Bankruptcy** | No | No | No | No | Yes |
| **Additional Characteristics** | • Made to students and parents primarily through college financial aid offices to fund 2-year, 4-year and graduate school college tuition, room and board<br>• Also available on a limited basis to students and parents to fund non-degree granting secondary education, including community college, part time, technical and trade school programs<br>• Both Title IV and non-Title IV schools (1) | • Made to students and parents through college financial aid offices and offices to fund 2-year and 4-year and graduate school college tuition, room and board<br>• Signature, Excel, Law, Med and MBA Loan brands<br>• Title IV schools only (1)<br>• Freshmen must have a co-signer with limited exceptions<br>• Co-signer stability test (minimum 3 year repayment history) | • Terms and underwriting criteria similar to Undergraduate, Graduate, Med/Law/MBA with primary differences being:<br>• Marketing channel<br>• No school certification<br>• Disbursement of proceeds directly to borrower<br>• Title IV schools only(1)<br>• Freshmen must have a co-signer with limited exceptions<br>• Co-signer stability test (minimum 3 year repayment history) | • Loans made to students and parents to refinance one or more private education loans<br>• Student must provide proof of graduation in order to obtain loan | • Loans made to students and parents to fund non-degree granting secondary education, including community college, part time, technical, trade school and tutorial programs<br>• Both Title IV and non-Title IV schools (1) |

(1) Title IV institutions are post-secondary institutions that have a written agreement with the Secretary of Education that allows the institution to participate in any of the Title IV federal student financial assistance programs and the National Early Intervention Scholarship and Partnership (NEISP) programs.

Confidential and proprietary information ©2013 Sallie Mae, Inc. All rights reserved.



# GLOSSARY OF TERMS

Confidential and proprietary information © 2013 Sallie Mae, Inc. All rights reserved.

Non-Dischargeable Loan – Private education loans are typically non-dischargeable; that is, they cannot be dismissed or eliminated in bankruptcy. For cases filed after October 7, 1998, private education loans are dischargeable only if a borrower can prove that having to repay the loan would impose an "undue hardship".

Non-Traditional Loans – SLM Private Education Loans made to borrowers attending for-profit schools with an original winning FICO score of less than 670 and borrowers attending not-for-profit schools with an original winning FICO score of less than 640.

Post-Default Recovery – All amounts received in respect to a charged-off loan after such student loan became a charged-off loan.

Private Consolidation Loans – Private Consolidation Loans allow eligible borrowers to combine several existing private credit student loans into one new loan.

26

# Exhibit F

EXHIBT "B"

## NOTE DISCLOSURE STATEMENT

$ 26,519.34
04759768
Loan No.

**Borrower(s)** TIANA JOHNSON
SARAH BANNISTER

**Student:** TIANA JOHNSON
**Date:** February 8, 2007

TIANA JOHNSON
711 AMSTERDAM AVE APT 81
NEW YORK , NY 10025 USA

**Lender Name and Address:**
CHARTER ONE BANK, N.A.
725 CANTON STREET
NORWOOD, MA 02062

This disclosure statement relates to your Loan Note disbursed on February 8, 2007
Because your Loan is either being disbursed or entering repayment, or the repayment terms are being modified, the following information about your Loan is being given to you.

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments scheduled. |
|---|---|---|---|
| 12.727 % | $ 109,140.00 | $ 24,000.00 | $ 133,140.00 |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are due | |
|---|---|---|---|
| 240 | $ 554.75 | On the 8th day of each month beginning | 9/2012 |
| | | | |
| | | | |
| | | | |

**VARIABLE RATE:** The Annual Percentage Rate, which is based on an index plus a margin, may increase during the term of the loan if the index rate increases. The index is (check one):

☐ **Prime Rate Index Adjusted Monthly** - The highest U.S. bank prime rate published in the "Money Rates" section of The Wall Street Journal (Eastern Edition) on the last business day of each calendar month.

☐ **Prime Rate Index Adjusted Quarterly** - The highest U.S. bank prime rate published in the "Money Rates" section of The Wall Street Journal (Eastern Edition) on the last business day of each calendar quarter.

☐ **LIBOR Index Adjusted Quarterly** - The average of the one-month London Interbank Offered Rates published in the "Money Rates" section of The Wall Street Journal (Eastern Edition) on the first business day of each of the three (3) calendar months immediately preceding the first day of each calendar quarter.

☒ **LIBOR Index Adjusted Monthly** - The one-month London Interbank Offered Rate published in the "Money Rates" section of The Wall Street Journal (Eastern Edition) on the first business day of the preceding calendar month.

Any increase in the index and the Annual Percentage Rate which occurs while principal payments are deferred will increase the amount of any current and all future payments. Any increase in the index and the Annual Percentage Rate which occurs while principal and interest payments are deferred will increase the amount of all future payments. Any increase in the index and the Annual Percentage Rate which occurs after you have begun to make principal and interest payments on your loan will increase the amount of your future principal and interest payments beginning with your next annual payment adjustment date. For example, assume you obtain a loan in your junior year, in the amount of $10,000, at an interest rate of 11%, and you defer principal and interest payments until after your graduation, and the repayment term of the loan is 20 years. If the interest rate increased to 12% on January 1st of your senior year, the interest which accrues while principal and interest payments are deferred will increase by $9.37, and your monthly principal and interest payments would increase by $9.37.

**LATE CHARGES:** If a payment is more than 15 days late, you may be charged $5.00 or 5% of the payment, whichever is less. If you default, Lender (or any subsequent holder of your Loan Note) may increase the margin used to compute the Annual Percentage Rate by two percentage points (2%).
**PREPAYMENT:** If you pay off early, you will not have to pay a penalty.

<u>Estimates:</u> All numerical disclosures except the late payment disclosure are estimates.

See your contract documents for any additional information about non-payment, default, any required repayment in full before the scheduled date, any security interest and prepayment refunds and penalties.

Principal Amount of Note (Amount Financed plus Prepaid Finance Charge)    $ 26,519.34

Itemization of Amount Financed
Amount paid to  TIANA JOHNSON  and    $
Amount paid to  SARAH BANNISTER    $ 24,000.00
Total Amount Financed    $ 24,000.00

Itemization of Prepaid Finance Charge
Origination Fee    $ 2,519.34
Total Prepaid Finance Charge(s)    $ 2,519.34

NSJUDP  Next Student Undergrad Loan    File Copy

# Exhibit G

1        IN THE UNITED STATES BANKRUPTCY COURT

2        FOR THE SOUTHERN DISTRICT OF TEXAS

3        HOUSTON DIVISION

4  EVAN BRIAN HAAS              §     CASE NO. 16-03175-H2-ADV
                               §     HOUSTON, TEXAS
5  VERSUS                      §     THURSDAY,
                               §     MARCH 23, 2017
6  NAVIENT, INC., ET AL        §     9:40 A.M. TO 1:01 P.M.

7

8        HEARING ON MOTION FOR PRELIMINARY INJUNCTION
                AND LIMITED CLASS CERTIFICATION

9        BEFORE THE HONORABLE DAVID R. JONES
              UNITED STATES BANKRUPTCY JUDGE

10

11

12              APPEARANCES:

   FOR THE PARTIES:                      SEE NEXT PAGE
13
   COURTROOM DEPUTY / COURT RECORDER:    DIYANA STAPLES
14

15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 ELDRIDGE ROAD, #144
22              SUGAR LAND, TEXAS 77478
          Tel: 281-277-5325 / Fax: 281-277-0946
23              www.judicialtranscribers.com

24

25     Proceedings recorded by electronic sound recording;
        transcript produced by transcription service.

1                          <u>APPEARANCES</u>:

2   FOR THE PLAINTIFF:              JASON W. BURGE, ESQ.
                                    FISHMAN HAYGOOD PHELPS
3                                     WALMSLEY WILLIS & SWANSON
                                    201 ST. CHARLES AVE., 46TH FL
4                                   NEW ORLEANS, LA  70170
                                    504-586-5241
5
                                    ADAM CORRAL, ESQ.
6                                   CORRAL TRAN SINGH, LLP
                                    1010 LAMAR ST., STE. 1160
7                                   HOUSTON, TX  77002
                                    832-975-7300
8
                                    MARK D. MYERS, ESQ.
9                                   ROSS BANKS MAY CRON & CAVIN PC
                                    7700 SAN FELIPE, STE. 550
10                                  HOUSTON, TX  77063
                                    713-626-1200
11
                                    LYNN E. SWANSON, ESQ.
12                                  JONES SWANSON HUDDELL
                                      AND GARRISON LLC
13                                  601 POYDRAS ST., STE. 2655
                                    NEW ORLEANS, LA  70130
14                                  504-523-2500

15                                  (VIA TELEPHONE)
                                    AUSTIN SMITH, ESQ.
16                                  AC SMITH LAW GROUP
                                    3 MITCHELL PLACE
17                                  NEW YORK, NY  10017
                                    917-992-2121
18
    FOR THE DEFENDANT:              THOMAS M. FARRELL, ESQ.
19                                  MCGUIRE WOODS LLP
                                    600 TRAVIS, STE. 7500
20                                  HOUSTON, TX  77002
                                    713-353-6677
21
                                    DION W. HAYES, ESQ.
22                                  MCGUIRE WOODS LLP
                                    GATEWAY PLAZA
23                                  800 EAST CANAL STREET
                                    RICHMOND, VA  23219-3916
24                                  804-775-1144

25

1   lines.  There is a -- just to be blunt about it --

2           THE COURT:  Sure.

3           MR. FARRELL:  -- I mean, there's a -- and I can't

4   remember whether it's in 4 of 6, but there's a chart in one

5   of them that talks about different kinds of student loans

6   and has a column that says, you know, dischargeable in

7   bankruptcy, yes or no?

8           THE COURT:  Okay.

9           MR. FARRELL:  And I believe that's in part what

10  they want to rely on and to that extent, whether it's a yes

11  or no in that chart, that's a legal conclusion which

12  ultimately this Court is going to make about whether these

13  loans are dischargeable or not.

14          THE COURT:  It's also a factual representation to

15  a public for whom they took money, correct?

16          MR. FARRELL:  It's a -- I understand it to be a

17  statement -- which by the way we don't have any of the

18  context for, but --

19          THE COURT:  No, I agree.

20          MR. FARRELL:  -- that's a different issue.

21          THE COURT:  Right.

22          MR. BURGE:  But a statement of somebody's view of

23  the legal issue that's actually --

24          THE COURT:  Not somebody's view, your client's

25  view.

1          IN THE UNITED STATES BANKRUPTCY COURT

2          FOR THE SOUTHERN DISTRICT OF TEXAS

3                HOUSTON DIVISION

4  EVAN BRIAN HAAS              §      CASE NO. 16-03175-H2-ADV
                               §      HOUSTON, TEXAS
5  VERSUS                       §      THURSDAY,
                               §      MARCH 23, 2017
6  NAVIENT, INC., ET AL         §      9:40 A.M. TO 1:01 P.M.

7

8          HEARING ON MOTION FOR PRELIMINARY INJUNCTION
                 AND LIMITED CLASS CERTIFICATION

9          BEFORE THE HONORABLE DAVID R. JONES
              UNITED STATES BANKRUPTCY JUDGE

10

11

12                      APPEARANCES:

FOR THE PARTIES:                      SEE NEXT PAGE
13
COURTROOM DEPUTY / COURT RECORDER:     DIYANA STAPLES
14

15

16

17

18

19

20               TRANSCRIPTION SERVICE BY:

21          JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 ELDRIDGE ROAD, #144
22                SUGAR LAND, TEXAS 77478
            Tel: 281-277-5325 / Fax: 281-277-0946
23             www.judicialtranscribers.com

24
        Proceedings recorded by electronic sound recording;
25          transcript produced by transcription service.

1    what I'm provided is a full copy.  I'm not going to need

2    it --

3              MR. FARRELL:  Okay.

4              THE COURT:  -- right now, but I do want to do that

5    before you-all leave this morning.

6              MR. FARRELL:  Very well, Your Honor, and if I

7    could just address the admission --

8              THE COURT:  Sure.

9              MR. FARRELL:  -- issue?  I recognize that

10   admission is not hearsay, but that relates to an admission

11   of fact.  What as I understand the portions of this document

12   they want to rely on, there's some statements, I believe --

13   and this would be a similar issue on Exhibit No. 6, that

14   purport to reach a legal conclusion with respect to the

15   dischargeability or not of certain types of student loans.

16             An admission as to a legal proposition, that's not

17   what the admission rule deals with.  The admission deals

18   with a statement of fact.

19             THE COURT:  Yeah, the only purpose that I would

20   review this would be for facts that are contained in this

21   document by Navient.  I'm assuming there's not a sentence in

22   here that says, "I know that these are dischargeable, but

23   I'm going to tell everyone that they're not."  I'm assuming

24   that that doesn't exist in there.

25             MR. FARRELL:  There is not a statement along those

1  lines.  There is a -- just to be blunt about it --

2          THE COURT:  Sure.

3          MR. FARRELL:  -- I mean, there's a -- and I can't

4  remember whether it's in 4 of 6, but there's a chart in one

5  of them that talks about different kinds of student loans

6  and has a column that says, you know, dischargeable in

7  bankruptcy, yes or no?

8          THE COURT:  Okay.

9          MR. FARRELL:  And I believe that's in part what

10  they want to rely on and to that extent, whether it's a yes

11  or no in that chart, that's a legal conclusion which

12  ultimately this Court is going to make about whether these

13  loans are dischargeable or not.

14          THE COURT:  It's also a factual representation to

15  a public for whom they took money, correct?

16          MR. FARRELL:  It's a -- I understand it to be a

17  statement -- which by the way we don't have any of the

18  context for, but --

19          THE COURT:  No, I agree.

20          MR. FARRELL:  -- that's a different issue.

21          THE COURT:  Right.

22          MR. BURGE:  But a statement of somebody's view of

23  the legal issue that's actually --

24          THE COURT:  Not somebody's view, your client's

25  view.

1           MR. FARRELL:  Well fair enough, but I say somebody

2    because I don't -- I mean, who knows within -- who actually

3    drafted it.

4           THE COURT:  My guess is Navient probably paid a

5    lot of money to get this done.

6           MR. FARRELL:  I don't doubt that, Your Honor.

7           THE COURT:  Fair enough.  And it says whatever it

8    says, and I mean, I'm assuming that -- and you would have

9    told me if there was, that this wasn't filed in error and

10   there isn't some filing with the SEC that withdraws it or

11   identifies that something is wrong, that this was, in fact,

12   filed with the SEC.  It was distributed to the public, and I

13   don't -- I assume you don't dispute that it came from the

14   EDGAR filing system.

15          MR. FARRELL:  To be honest, Your Honor, I have

16   downloaded it from a website.  Whether it's actually filed

17   with the SEC, I don't personally know.  I'm not doubting

18   Counsel's statement to that effect.  If he tells me that --

19          THE COURT:  He told me and I want to make sure, I

20   thought I heard you say you got it from EDGAR?

21          MR. BURGE:  I believe we got it from EDGAR.  Now

22   let me -- I don't want to make any misrepresentations.  Like

23   I say, I know I got No. 6 from EDGAR.  I believe I got No. 4

24   from EDGAR.  I know for sure it's available in the

25   industrial relations section of their website.

1          MR. FARRELL:  Thank you, Your Honor.

2          I want to start where the Court started, which is

3    this issue of whatever word we're going to use for

4    provisional Class Certification, preliminary Class

5    Certification, I don't dispute that there's a Ninth Circuit

6    case out there and maybe a few others that say that in

7    certain circumstances that remedy is potentially available.

8          I will say I'm not aware of any Fifth Circuit case

9    that has addressed whether you can do it or how you go about

10   it, but more fundamentally, the question I have is why?

11         Let's assume for a moment the Court has the

12   general authority to do a provisional or early Class

13   Certification.  You would typically expect that to happen

14   when there is a true emergency and the party needs to get

15   into court, gets some provisional relief on some kind of

16   expedited basis.

17         This case was filed eight months ago.

18         THE COURT:  Yeah, let me ask you -- and I want to

19   be practical about this.  I've seen the effects of

20   collection activities first hand.  I mean, I've seen people

21   who come in and they can't carry on a conversation without

22   breaking into tears.  I've seen kids who won't answer the

23   telephone because they're afraid.  You know, I've seen --

24   and I've seen minority children who won't look a white

25   person in the eye because they've been told that's the bill

1  collector.

2        The effects are real and they're serious and

3  they're -- I mean, they can have an impact on someone's

4  life.  And so the context of the timing, I will just tell

5  you, I'm not bothered by at all.  What I would suggest,

6  because this has got to be a -- this has got to be a fairly

7  readily identifiable subclass of the Navient portfolio.

8  I've -- you know, over the course of time, I know what kind

9  of computer records that creditors like Navient keep.  They

10  have to because their portfolio is so huge and they have to

11  be able to manage the data.

12        I don't know why that without waiving any rights

13  or complaints, and I promise you I'm going to set, you know,

14  the Motion to Dismiss for a timely hearing.  I know that

15  there's got to be some discovery.  I don't know why Navient

16  wouldn't simply agree to suspend any collection activities

17  against folks who are covered by the definition that is

18  included.  I mean, you know, I've read it.  I would probably

19  make one tweak to it, but it's not substantive because if it

20  turns out -- if it turns out that you're wrong, it elevates

21  the ultimate damage model tremendously in my mind and I'm

22  not suggesting that your folks have any liability.  I don't

23  know enough yet to even fully grasp.

24        You know, I hear people talking about, you know,

25  non-accredited and accredited and you know, career loans

# Exhibit H

IN THE CIRCUIT COURT FOR THE FOURTH JUDICIAL CIRCUIT
IN AND FOR DUVAL COUNTY, FLORIDA

DONNA HANDFORTH, ELLEN D.
REEVES, TERESA FERGUSON, PAMELA
BRENNAN and KRISTI SHANAHAN-
LUKE, Individually, and on behalf of all others
similarly situated,

       Case No:  2010-CA-003310

       Plaintiffs,

v.

THE STENOTYPE INSTITUTE OF
JACKSONVILLE, INC., a Florida
Corporation, GLORIA J. WILEY,
Individually, SLM CORPORATION, SALLIE
MAE, INC., and DOES 1-10, Inclusive,

       Defendants

_____/

## ORDER

**THIS CAUSE** came to be heard before this Court on: (1) Plaintiffs' Second Motion to
Compel Discovery and for Sanctions against Defendant Sallie Mae, Inc.; and (2) Defendant
Sallie Mae, Inc.'s Objections to Plaintiffs' Notice of Deposition of Corporate Representative.
Appearing at the hearing on March  21, 2013 were:  Janet Varnell and Brian Warwick for
Plaintiffs; Alfred Frith and Jennifer Craddock for Defendants Stenotype Institute of Jacksonville,
Inc. ("SIJ") and Gloria J. Wiley; and Lisa Simonetti for Defendants SLM Corporation and Sallie
Mae, Inc. (jointly, "Sallie Mae").

Having reviewed all the briefs and pleadings, and having received argument from counsel
on the issues, the Court makes the following findings of fact:

1.     In a September 23, 2011 letter, Counsel for Sallie Mae, Lisa Simonetti, made the
following factual assertions:

First, Plaintiffs obtained their SIJ student loans through the Federal Family Education Loan Program ("FFELP"). Plaintiffs' FFELP loans, although privately originated prior to June 30, 2010 and privately services, were sold to and are owned by the federal government. When Plaintiffs applied for and received FFELP loans for the first time, they were required to complete a Master Promissory Note ("MPN"). The MPN provides that Plaintiffs will repay their FFELP loans, and any accrued interest and fees, to the Department of Education, i.e., the federal government, which owns the FFELP loans. Accordingly, Plaintiffs have no rights against SLM or SMI under the holder rule.

2.      Plaintiffs sued Sallie Mae on the basis of the "holder clause," which generally makes the holder of the loan at issue liable along with the seller of the service at issue. Based on the factual assertion that the federal government was the holder of all of the student loans at issue in this lawsuit, Counsel for Sallie Mae stated: "We look forward to your prompt confirmation that the Complaint will be dismissed."

3.      When asked by Plaintiffs' Counsel to provide evidence to support the assertion that Plaintiffs' loans were owned by the federal government, Counsel for Sallie Mae, Lisa Simonetti, provided the Declaration of Sallie Mae employee James Austin. The Austin Declaration confirmed that loans held by Plaintiffs were owned by the Department of Education. However, the Austin Declaration failed to list all the loans held by each named Plaintiff and failed to list any loans owed by Plaintiff Ellen Reeves.

4.      Later deposition testimony of James Austin established that only some, but not all, of Plaintiffs' loans were owned by the Department of Education. Other loans were owed by entities related to Sallie Mae. Austin further testified that his declaration had been prepared for him by Counsel.

2

5.      Sallie Mae employee April Sherman, later testified by deposition that some of the active loans at issue are held by SLM ECFC, a Sallie Mae entity, while other active loans are held by the Department of Education.  Other loans have been paid off and are no longer active.

6.      Ms. Simonetti made no effort in later correspondence to correct any misstatements made to Plaintiffs' Counsel in prior correspondence.

7.      This Court finds that Defendant Sallie Mae and its Counsel, Ms. Simonetti, made false and misleading statements regarding material facts in this case in an effort to have the case against Sallie Mae dismissed.  When making such assertions, counsel has a duty to make certain that such statements are true and accurate.

As such, it is hereby **ORDERED AND ADJUDGED:**

1.      Plaintiffs' Second Motion to Compel Discovery is hereby GRANTED.  On or before April 8, 2013, Sallie Mae shall produce documents from databases it can access that indicate the holders of any and all loans related to each student identified on the list previously provided by Defendant, SIJ.  Each student identified on the SIJ list shall be given a specific identification number that corresponds to the order in which each student appears on the SIJ list. If a loan has been paid off, is no longer active, or the student no longer owes the debt, Sallie Mae shall produce documents indicating that the loan is no longer active and identifying the last known holder of each such loan for each student.  Sallie Mae shall also provide information necessary to determine the full name and business address of any holder identified through number or other abbreviation on the documents being produced.  The name, address, telephone number, and social security number of each student shall be redacted on any Sallie Mae documents being produced.  Specific student information and loan holder data must be presented in a way that allows Plaintiffs to ensure the accurateness and completeness of these responses.

3

2.    Plaintiffs' request for an award of attorney fees and costs from Sallie Mae, incurred in connection with obtaining the correct information about the holders of the SIJ student loans, is hereby GRANTED.   The amount of attorney fees and costs shall be determined by separate motion and Sallie Mae shall be permitted to advance any objections to the reasonableness or necessity of those fees and costs.

3.    Plaintiffs' Motion to Compel the deposition of Sallie Mae's Corporate Representative is hereby GRANTED.   The objections to Plaintiffs' Notice of Deposition of Corporate Representative made by Sallie Mae are hereby DENIED.   Sallie Mae shall produce a corporate representative pursuant to Fla. R. Civ. P. 1.310(b)(6) to testify regarding the subject matters identified on Plaintiffs' Notice of Deposition of Corporate Representative dated August 10, 2012, at a mutually agreeable date and time.   Counsel for Sallie Mae shall promptly provide dates for the deposition, which shall be held no later than thirty (30) days from the date of this Order.

DONE AND ORDERED in Chambers, at Jacksonville, Duval County, Florida this _____ _____ day of _____, 2013.

ORDER ENTERED
APR 09 2013

_____ /s/ Jean M. Johnson
Honorable Jean M. Johnson
United States District Judge

Copies furnished:

All Counsel of Record

4

# Exhibit I

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


EVAN BRIAN CROCKER,              )     CASE NO: 16-03175
                                )     ADVERSARY
                Plaintiff,      )
                                )     Houston, Texas
        vs.                     )
                                )     Thursday, August 27, 2020
NAVIENT, INC, ET AL,            )
                                )     1:03 p.m. to 1:22 p.m.
                Defendants.     )


HEARING

BEFORE THE HONORABLE DAVID R. JONES,
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:              See page 2


Court Reporter:           Recorded; FTR

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES FOR:**

Plaintiff:                JASON W. BURGE, ESQ.
                          Fishman Haygood, LLP
                          201 St. Charles Ave.
                          Suite 4600
                          New Orleans, LA 70170

                          LYNN E. SWANSON, ESQ.
                          Jones Swanson Huddell & Garrison
                          601 Poydras St.
                          Suite 2655
                          New Orleans, LA 70130

                          AUSTIN SMITH, ESQ.


Defendants:               THOMAS M. FARRELL, ESQ.
                          McGuireWoods, LLP
                          600 Travis
                          Suite 7500
                          Houston, TX 77002

7

1    opportunity to sit down and just get this case settled once and

2    for all.

3            We did try to mediate the case before the Fifth

4    Circuit had ruled, and frankly it was too early at that point

5    because neither side had their arms around the numbers and the

6    dollars involved in the nationwide class.

7            Now that it's a Southern District class, we do have

8    our arms around it, at least Navient does, and we've shared

9    some information in that regard with the Plaintiffs.  We

10   understand they're going to need some time to, you know, verify

11   the information that we've given them, but it is a much more

12   manageable situation.

13           We have our arms around it, and we really think it's

14   not only in Navient's interest, we think it's in the class's

15   interest over the next, you know, 30 to 45 days, the parties

16   sit down and do their best to resolve this case.

17           And we would like the opportunity to do that without

18   having to, at the same time, be responding to the class

19   certification motion and preparing for a class certification

20   hearing, which is the reason we filed the motion that we did.

21           **THE COURT:**  All right.

22           **MR. FARRELL:**  You know, I can't commit to the Court,

23   obviously, that a settlement is necessarily going to result.  I

24   can commit to the Court that given now that we know the

25   geographic scope of the class, of any class, that we have our

8

1    arms around the numbers.  You know, I have recommended to

2    Navient that we do everything we can to get this case settled.

3    Navient has given me the instructions to do everything we

4    reasonably can to get this settled.  And we think that's what

5    makes the most sense at this point.

6         **(Pause)**

7         **MR. BURGE:**  So, the addition would be the footnote

8    with the two stars?

9         **THE COURT:**  Yeah, and then I'd put the two stars

10   right there.

11        **MR. BURGE:**  On the --

12        **THE COURT:**  Right there.  There I'll --

13        **MR. BURGE:**  With the caveat that we think that relief

14   would be appropriate nationwide, we don't have any objection to

15   that.

16        **THE COURT:**  All right.  It's -- I think that you're

17   doing the rest of this by -- or you're doing all of this by

18   agreement, and all we're just simply noticing is that that

19   paragraph applies, in this order, applies only to borrowers in

20   the Southern District of Texas; all the other provisions apply

21   nationally.

22        And this, of course, does not stop you from asking

23   for similar or different relief in any other court other than

24   this one.

25        **MR. BURGE:**  Understood, your Honor.

## CERTIFICATION

I certify that the foregoing is a correct transcript from the
electronic sound recording of the proceedings in the above-
entitled matter.


_____                    **September 14, 2020**

            Signed                                          Dated


                    *TONI HUDSON, TRANSCRIBER*